**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

CVS PHARMACY, INC., CAREMARK RX,
L.L.C., ARKANSAS CVS PHARMACY,
L.L.C., CP ACQUISITION, LLC,
ADVANCED CARE SCRIPTS, INC., AMC-
TENNESSEE, LLC, CAREMARK ARIZONA
MAIL PHARMACY, LLC, CAREMARK
ARIZONA SPECIALTY PHARMACY, L.L.C.,
CAREMARK FLORIDA MAIL PHARMACY,
LLC, CAREMARK FLORIDA SPECIALTY
PHARMACY, LLC, CAREMARK ILLINOIS
SPECIALTY PHARMACY, LLC,
CAREMARK KANSAS SPECIALTY
PHARMACY, LLC, CAREMARK
MASSACHUSETTS SPECIALTY
PHARMACY, LLC, CAREMARK
MICHIGAN SPECIALTY PHARMACY, LLC,
CAREMARK NEW JERSEY SPECIALTY
PHARMACY, LLC, CAREMARK NORTH
CAROLINA SPECIALTY PHARMACY, LLC,
CAREMARK TENNESSEE SPECIALTY
PHARMACY, LLC, CAREMARK TEXAS
MAIL PHARMACY, LLC, CAREMARK,
L.L.C., CAREMARKPCS PENNSYLVANIA
MAIL PHARMACY, LLC, CENTRAL RX
SERVICES, LLC, CORAM ALTERNATE
SITE SERVICES, INC., CVS CAREMARK
ADVANCED TECHNOLOGY PHARMACY,
L.L.C., CVS RX SERVICES, INC., EXPRESS
PHARMACY SERVICES OF PA, LLC,
HOLIDAY CVS, L.L.C., I.G.G. OF
AMERICA, LLC, JHC ACQUISITION LLC,
NCS HEALTHCARE OF KENTUCKY, LLC,
PHARMACY CONSULTANTS, LLC,
PROCARE PHARMACY DIRECT, L.L.C.,
PROCARE PHARMACY, L.L.C.,
SILVERSCRIPT INSURANCE COMPANY,
COVENTRY HEALTH AND LIFE
INSURANCE COMPANY, COVENTRY
HEALTH CARE OF KANSAS, INC., and
COVENTRY HEALTH CARE OF MISSOURI,
INC.,

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 29 2025

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

Civil Action No. 4:25cv524-BSM

This case assigned to District Judge *Miller*
and to Magistrate Judge *Harris*

1

Plaintiffs,

v.

ARKANSAS STATE BOARD OF
PHARMACY; RODNEY RICHMOND,
BRIAN JOLLY, DEBBIE MACK, LENORA
NEWSOME, CLINT BOONE, LYN
FRUCHEY, HAROLD H. SIMPSON, and
BETH ANN DAVENPORT, in their official
capacities as members of the Arkansas State
Board of Pharmacy; and JOHN KIRTLEY, in
his official capacity as Executive Director of the
Arkansas State Board of Pharmacy,

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs CVS Pharmacy, Inc., Caremark Rx, L.L.C., Arkansas CVS Pharmacy, L.L.C.,

CP Acquisition, LLC, Advanced Care Scripts, Inc., AMC-Tennessee, LLC, Caremark Arizona

Mail Pharmacy, LLC, Caremark Arizona Specialty Pharmacy, L.L.C., Caremark Florida Mail

Pharmacy, LLC, Caremark Florida Specialty Pharmacy, LLC, Caremark Illinois Specialty

Pharmacy, LLC, Caremark Kansas Specialty Pharmacy, LLC, Caremark Massachusetts

Specialty Pharmacy, LLC, Caremark Michigan Specialty Pharmacy, LLC, Caremark New Jersey

Specialty Pharmacy, LLC, Caremark North Carolina Specialty Pharmacy, LLC, Caremark

Tennessee Specialty Pharmacy, LLC, Caremark Texas Mail Pharmacy, LLC, Caremark, L.L.C.,

CaremarkPCS Pennsylvania Mail Pharmacy, LLC, Central Rx Services, LLC, Coram Alternate

Site Services, Inc., CVS Caremark Advanced Technology Pharmacy, L.L.C., CVS Rx Services,

Inc., Express Pharmacy Services of PA, LLC, Holiday CVS, L.L.C., I.G.G. of America, LLC,

JHC Acquisition LLC, NCS Healthcare of Kentucky, LLC, Pharmacy Consultants, LLC,

ProCare Pharmacy Direct, L.L.C., and ProCare Pharmacy, L.L.C. (collectively, "CVS"); and

2

Plaintiffs SilverScript Insurance Company, Coventry Health and Life Insurance Company, Coventry Health Care of Kansas, Inc., and Coventry Health Care of Missouri, Inc. (collectively, "Affiliated Medicare Sponsors"), allege as follows:

## INTRODUCTION

1.    In recent years, Arkansas lawmakers and local pharmacies have complained that out-of-state pharmacies were crowding local players out of the market. These pharmacies worried that they would be squeezed out of the fiercely competitive pharmacy market unless something was done to slow or stop national chains' expansion of their operations in the State. Just last year, for example, 340,000 Arkansans filled more than 2.7 million prescriptions at a CVS pharmacy. Independent Arkansas pharmacies (and their allies in the Arkansas General Assembly) see the substantial market share held by out-of-state chains as millions of prescriptions that they could be filling.

2.    Last month, Arkansas enacted a new law to solve this supposed problem. House Bill 1150 (HB 1150), signed into law by the Governor as Act 624, seeks to protect "locally-operated pharmacies" from supposed "anticompetitive business tactics" by larger national chains. Openly targeting out-of-state pharmacies would be a straightforward constitutional violation. So HB 1150 instead targets pharmacy benefits managers, or PBMs. PBMs, which are operated by companies like Cigna and United Healthcare, act as intermediaries to administer prescription-drug programs, securing favorable pricing from pharmaceutical manufacturers and pharmacies for the benefit of prescription-drug plans and their members. PBMs play a valuable role because they can use their purchasing power and networks to negotiate lower drug prices from pharmaceutical manufacturers and lower reimbursement rates from pharmacies, which in turn reduces the cost of drugs for patients. Some PBMs share a corporate affiliation with a

pharmacy, an arrangement that brings economies of scale that further reduce costs to patients. Such integrated pharmacy operations include mail-order pharmacies and other pharmacies that typically supply drugs across state lines, as well as brick-and-mortar pharmacies.

3.    The vast majority of PBM-affiliated pharmacies operating in Arkansas are out-of-state entities like CVS, Cigna, and Optum.  The vast majority of in-state pharmacies, by contrast, do not have a corporate affiliation with a PBM.  As a result, HB 1150's ban on PBM-affiliated pharmacies turns out to be a nearly perfect proxy for banning only out-of-state pharmacies. Remarkably, the law as enacted bars *only* out-of-state pharmacies from participating in the Arkansas marketplace.

4.    That proxy relationship is no mere happenstance; it is by design.  In the eyes of HB 1150's proponents, out-of-state national chains like CVS were leveraging their scale to gain market share at the expense of in-state competitors.  Many advocates for the bill saw HB 1150 as a means by which the State could tilt the playing field in favor of locally owned pharmacies. Numerous lawmakers and interest groups openly celebrated the law because it promised to drive Rhode Island-based CVS, in particular, out of the State.  The bill's advocates complained, for instance, that "the little guy's got no chance at all" against national stores like CVS and that "small-town" pharmacies would close if the legislature didn't "do something."

5.    But the PBM proxy had one serious problem—one that is often fatal in Arkansas. HB 1150 almost died in committee because, as originally drafted, it also covered Walmart. Legislators realized that Walmart effectively operates PBM-affiliated pharmacies, meaning that HB 1150, in its original form, would likely apply to the State's largest employer.   Some lawmakers viewed that as a dealbreaker:  As one state senator publicly explained, one of the

reasons he could not vote for HB 1150 was because it would have prevented Walmart "from being able to have pharmacies."

6.      HB 1150's architects devised a fix.  Notwithstanding the legislature's putative concern that PBMs act as "fox[es] guarding the henhouse" when they serve as "a price setter and price taker," HB 1150 § 1(b), HB 1150 was amended to include an exemption for PBM-affiliated pharmacies if the PBM serves only the pharmacy's own employee benefit plan.  That exemption covers Walmart.  So while Walmart could continue to operate its pharmacies, one of its biggest out-of-state competitors—CVS—would be forced to leave Arkansas altogether.  HB 1150's critics saw through this ruse.  Senator Missy Irvin criticized the bill because it picked "winners and losers" through the patently anti-competitive means of "deny[ing]" some businesses the opportunity "to operate" in Arkansas.

7.      One would expect that, under the law's professed rationale, legislators would have been bothered about the employees of the State's largest employer suffering from "price inflation."  But the law's true purpose was never to target price inflation.  Instead, this exemption underscores its goal was to knock out a predetermined group of out-of-state pharmacies— including the largest and most successful interstate mail-order and specialty pharmacies that provide prescription drugs to Arkansans—to protect their in-state competitors.

8.      Notwithstanding the many sharp allegations that lawmakers have made against CVS or other out-of-state pharmacies, the State ignores the protections that Arkansas law already affords to pharmacies that are not affiliated with a PBM.  In fact, Arkansas law already requires PBMs to reimburse nonaffiliated pharmacies at the same or higher rate than affiliated pharmacies.  CVS, for example, has repeatedly explained that its PBM reimburses nonaffiliated pharmacies at a higher rate than its own pharmacies.  And if supposed price inflation were the

real concern, Arkansas could have used plenty of narrower tools to regulate how PBMs operate without taking the blunderbuss approach of banning all affiliated pharmacies from operating in the State.

9.    In expelling PBM-affiliated pharmacies like CVS from Arkansas, HB 1150 represents an assault on free commerce between the States and the foundational principles of fair-market competition that underpin the Union.   The law improperly seeks to leverage the State's licensing power—which is meant to ensure public safety and health—to pick economic winners and losers.   The immediate winners are apparent.   HB 1150 paves the way for in-state pharmacies to fill the vacuum left by CVS and other out-of-state competitors.   Walmart has announced plans to expand its pharmacy offerings in Arkansas, and has seen a huge uptick in prescription orders since HB 1150 was enacted.   Basic economic principles confirm that independent pharmacies in Arkansas will also enjoy increased market share as out-of-state competitors are forced out.

10.    But the law will produce its fair share of losers, too.    Non-Arkansas-headquartered pharmacies like CVS who are affiliated with PBMs will be forced to stop serving Arkansans unless they radically restructure their organizations.   For CVS, that is no choice at all, because CVS's business model is predicated on taking the efficiencies that flow from its PBM affiliation to pass along lower prices and more convenient services for customers, as well as serving nationwide prescription drug plans for clients including health plans, unions, private employers, and government plans that have Arkansas residents as members.   Thus, if HB 1150 goes into effect as scheduled on January 1, 2026, CVS will have to cease not only its operations at 23 CVS retail pharmacies across the State, but also its mail-order and specialty-pharmacy services.   Indeed, the law will likely shut down a substantial portion of all mail-order and

specialty-pharmacy prescriptions flowing into the State because the majority of such providers are out-of-state pharmacies with PBM affiliations.

11.    The costs will also ripple beyond Arkansas's borders. Many employer-sponsored and federal government-sponsored plans must design networks for beneficiaries across the 50 States. But HB 1150 will require these networks to be designed in Arkansas-specific ways to minimize administrability costs. And if other States follow Arkansas's lead, the web of patchwork rules from different jurisdictions will likely make it impracticable for employers and the federal government to administer uniform nationwide plans, as federal law contemplates.

12.    HB 1150 violates the U.S. Constitution in multiple, independent ways. First, the law's effects raise the unavoidable inference that the law is a blatantly protectionist measure that flouts the "antidiscrimination principle" that lies "at the very core" of the Dormant Commerce Clause. *Nat'l Pork Producers Council* v. *Ross*, 598 U.S. 356, 369 (2023) (citation and quotation marks omitted). Indeed, HB 1150 bars *only* out-of-state pharmacies from participating in the Arkansas marketplace, and—thanks to the last minute-amendment —the law does not affect a *single* Arkansas-based pharmacy.

13.    If that disparity were not telling enough, the history and context of the law confirm its protectionist purpose. Arkansas's lawmakers publicly boasted at press conferences, in tweets, on podcasts, and even on the legislative floor that the law would drive CVS from its borders while helping those pharmacies that had deep roots in the State. In short, there is abundant evidence that the State was motivated to protect in-state pharmacies—both independent pharmacies and Walmart—from out-of-state competitors like CVS. The State cannot hide this impermissible purpose behind the proxy of PBM affiliation, because "[w]hat cannot be done

directly cannot be done indirectly. The Constitution deals with substance, not shadows." *SFAA* v. *President and Fellows of Harvard College*, 600 U.S. 181, 230 (2023).

14.    The law also separately violates the Dormant Commerce Clause because the burdens that it imposes on interstate commerce are clearly excessive in relation to the putative local benefits, which are already advanced by existing Arkansas statutes. *See Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

15.    Second, the law violates the U.S. Constitution's Equal Protection Clause by banning CVS and most other PBM-affiliated pharmacies from Arkansas while providing an exemption designed to cover the only Arkansas-based pharmacy affiliated with a PBM, without a rational justification for this distinction. In particular, HB 1150's differential treatment of CVS and similar out-of-state pharmacies as compared to Walmart is wholly irrational in light of the law's purported aim to eradicate situations where PBMs "act as both a price setter and a price taker." That dynamic applies with equal force whether the PBM broadly services a variety of plan clients throughout the State or deals only with a single Arkansas plan client (that happens to be its own pharmacy affiliate's employee benefit plan).

16.    Third, HB 1150 violates the U.S. Constitution's Supremacy Clause because it is expressly preempted by multiple federal statutes. For starters, the law impermissibly interferes with the uniform nationwide administration of employee benefit plans governed by the Employee Retirement Income Security Act of 1974 (ERISA) by preventing those plans from relying on PBM-affiliated pharmacies (including mail-order pharmacies) in Arkansas even though many plan sponsors have relied on this integrated model to meet their participants' needs. Under settled case law interpreting ERISA's broad express preemption provision, HB 1150 is thus preempted as a law that "relates to" such ERISA plans. 29 U.S.C. § 1144(a). And the law

is also preempted by the Medicare Prescription Drug Improvement and Modernization Act of 2003 (MMA) because it seeks to regulate Medicare Advantage and Medicare Part D plans that Congress intended for federal standards to exclusively govern. 42 U.S.C. § 1395w-26(b)(3).

17.     As a result of these constitutional violations, this Court should issue prompt injunctive relief to prevent the implementation and enforcement of HB 1150. Without this relief, CVS will incur immense and irreparable harms from complying with this patently unlawful statute.

18.     CVS faces concrete, here-and-now economic injuries. Without injunctive relief, CVS has only a matter of months to shutter its operations and retreat from Arkansas's markets before the law takes effect on January 1, 2026. Unsurprisingly, winding down operations at 23 retail pharmacies and the other services that provide critical medicine to tens of thousands of Arkansans takes time. Absent an injunction, CVS faces the Hobson's choice of either beginning that long process in an orderly way to ensure that patients find other ways of obtaining medical care or betting on this litigation in hopes of invalidating the law at the last second—at great economic cost if the law goes into effect. This is not a choice that the Constitution allows Arkansas to impose. *See Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200, 220 (1994) (Scalia, J., concurring) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.").

19.     Indeed, HB 1150 has already begun taking a toll on CVS. CVS has lost patients in Arkansas to in-state competitors, and the law is making it more difficult for the company to attract and retain employees in Arkansas. In the near future, state law will require CVS to notify patients and patients' prescribing healthcare providers at least two months before HB 1150 goes into effect that the pharmacy will soon be unable to dispense retail drugs. Ark. Code Ann. § 17-

92-4117(c). These harms are entirely predictable effects of the law and cannot be sufficiently redressed at a later date in the ordinary course of litigation. *Cf. Int'l Franchise Ass'n, Inc.* v. *City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015) ("A rule putting plaintiffs at a competitive disadvantage constitutes irreparable harm.").

20.    Only an injunction can restore the balance of equities after the State put its thumb on the scale against out-of-state companies like CVS.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because CVS's causes of action arise under the laws and Constitution of the United States, including ERISA, the MMA, the Dormant Commerce Clause, and the Equal Protection Clause of the United States Constitution.

22.    This Court has personal jurisdiction over Defendants because Defendants' principal place of business is within the Eastern District of Arkansas.

23.    Venue is proper under 28 U.S.C. § 1391 because the events giving rise to these claims occurred in this District and Defendants reside within the State of Arkansas.

24.    The Court has authority to award relief against the Defendants under 42 U.S.C. § 1983. The Court also has jurisdiction under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908). *See Verizon Md., Inc.* v. *Pub. Serv. Comm'n*, 535 U.S. 635, 645-46 (2002) (recognizing the availability of an *Ex Parte Young* action against regulatory commissioners in their official capacities). Further, the Court can award injunctive relief under 28 U.S.C. § 1651, and it can award declaratory and other appropriate relief under 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

### A.    Plaintiffs[1]

25.    CVS Pharmacy, Inc. (CVS Pharmacy) is a Rhode Island corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Pharmacy, directly and through its subsidiaries, operates a chain of more than 9,000 retail pharmacies across the United States, including 23 retail locations in Arkansas, and also provides mail pharmacy fulfillment through its Caremark subsidiaries and dozens of other pharmacies located outside Arkansas. CVS Pharmacy has several groups of subsidiaries that are licensed to provide pharmacy services, including CVS Specialty, which operates specialty pharmacies and specialty mail-order pharmacy services. CVS Pharmacy is a direct and wholly owned subsidiary of CVS Health Corporation (CVS Health).

26.    Caremark Rx, L.L.C. (Caremark) is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. Caremark Rx, L.L.C., through its operating subsidiaries and affiliates, operates a PBM that conducts business in all 50 states. Caremark Rx, L.L.C. is a direct subsidiary of CVS Pharmacy.

27.    Arkansas CVS Pharmacy, L.L.C. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. Arkansas CVS Pharmacy, L.L.C. holds 23 resident pharmacy licenses necessary for all CVS retail pharmacies in Arkansas to hold and dispense medications to patients in the state. Arkansas CVS Pharmacy, L.L.C. is a direct subsidiary of CVS Pharmacy.

28.    CP Acquisition, LLC is located at 7301 Industry Drive North, Little Rock, Arkansas 72117. CP Acquisition, LLC holds a resident pharmacy license in Arkansas necessary

---

[1]    Although each of the below described subsidiaries (other than the Affiliated Medicare Sponsors) is the holder of the relevant Arkansas license, Plaintiffs collectively refer to the licensed entities in the remainder of the complaint as CVS solely for convenience. The complaint references Caremark, however, when discussing the PBM in particular.

to operate a single pharmacy under the name "Omnicare of Little Rock." CP Acquisition, LLC is an indirect subsidiary of CVS Pharmacy.

29.     Advanced Care Scripts, Inc. is located at 6251 Chancellor Drive, Orlando, Florida 32809. Advanced Care Scripts, Inc. holds a non-resident pharmacy license in Arkansas. Advanced Care Scripts, Inc. is an indirect subsidiary of Caremark.

30.     AMC-Tennessee, LLC is located at 1682 Elm Hill Pike, Nashville, Tennessee 37210. AMC-Tennessee, LLC holds a non-resident pharmacy license in Arkansas. AMC-Tennessee, LLC is an indirect subsidiary of CVS Pharmacy.

31.     Caremark Arizona Mail Pharmacy, LLC is located at 4755 South 44th Place, Phoenix, Arizona 85040. Caremark Arizona Mail Pharmacy, LLC holds a non-resident pharmacy license in Arkansas. Caremark Arizona Mail Pharmacy, LLC is an indirect subsidiary of Caremark.

32.     Caremark Arizona Specialty Pharmacy, L.L.C. is located at 2700 West Frye Road, Chandler, Arizona 85224. Caremark Arizona Specialty Pharmacy, L.L.C. holds a non-resident pharmacy license in Arkansas. Caremark Arizona Specialty Pharmacy, L.L.C. is an indirect subsidiary of Caremark.

33.     Caremark Florida Mail Pharmacy, LLC is located at 9310 SouthPark Center Loop, Orlando, Florida 32819. Caremark Florida Mail Pharmacy, LLC holds a non-resident pharmacy license in Arkansas. Caremark Florida Mail Pharmacy, LLC is an indirect subsidiary of Caremark.

34.     Caremark Florida Specialty Pharmacy, LLC is located at 7930 Woodland Center Blvd., Tampa, Florida 33614. Caremark Florida Specialty Pharmacy, LLC holds a non-resident

pharmacy license in Arkansas. Caremark Florida Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

35.     Caremark Illinois Specialty Pharmacy, LLC is located at 800 Biermann Court, Mount Prospect, Illinois 60056. Caremark Illinois Specialty Pharmacy, LLC holds a non-resident pharmacy license in Arkansas. Caremark Illinois Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

36.     Caremark Kansas Specialty Pharmacy, LLC is located at 11162 Renner Blvd., Lenexa, Kansas 66219. Caremark Kansas Specialty Pharmacy, LLC holds a non-resident pharmacy license in Arkansas. Caremark Kansas Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

37.     Caremark Massachusetts Specialty Pharmacy, LLC is located at 25 Birch St., Milford, Massachusetts 01757. Caremark Massachusetts Specialty Pharmacy, LLC holds a non-resident pharmacy license in Arkansas. Caremark Massachusetts Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

38.     Caremark Michigan Specialty Pharmacy, LLC is located at 1307-H Allen Dr., Troy, Michigan 48083. Caremark Michigan Specialty Pharmacy, LLC holds a non-resident pharmacy license in Arkansas. Caremark Michigan Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

39.     Caremark New Jersey Specialty Pharmacy, LLC is located at 180 Passaic Ave., Fairfield, New Jersey 07004. Caremark New Jersey Specialty Pharmacy, LLC holds a non-resident pharmacy license in Arkansas. Caremark New Jersey Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

40.    Caremark North Carolina Specialty Pharmacy, LLC is located at 10700 World Trade Blvd., Raleigh, North Carolina 27617.    Caremark North Carolina Specialty Pharmacy, LLC holds a non-resident pharmacy license in Arkansas.    Caremark North Carolina Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

41.    Caremark Tennessee Specialty Pharmacy, LLC is headquartered at 8370 Wolf Lake Dr., Bartlett, Tennessee 38133.    Caremark Tennessee Specialty Pharmacy, LLC holds a non-resident pharmacy license in Arkansas.    Caremark Tennessee Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

42.    Caremark Texas Mail Pharmacy, LLC is located at 7034 Alamo Downs Pkwy., San Antonio, Texas 78238.    Caremark Texas Mail Pharmacy, LLC holds a non-resident pharmacy license in Arkansas.    Caremark Texas Mail Pharmacy, LLC is an indirect subsidiary of Caremark.

43.    Caremark, L.L.C. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895.    Caremark, L.L.C. holds five non-resident pharmacy licenses in Arkansas.    Caremark, L.L.C. is a subsidiary of Caremark.

44.    CaremarkPCS Pennsylvania Mail Pharmacy, LLC is located at 1 Great Valley Blvd., Wilkes Barre, Pennsylvania 18706.    CaremarkPCS Pennsylvania Mail Pharmacy, LLC holds a non-resident pharmacy license in Arkansas.    CaremarkPCS Pennsylvania Mail Pharmacy, LLC is an indirect subsidiary of Caremark.

45.    Central Rx Services, LLC is located at 1451 Center Crossing Rd., Las Vegas, Nevada 89144.    Central Rx Services, LLC holds a non-resident pharmacy license in Arkansas. Central Rx Services, LLC is an indirect subsidiary of Caremark.

46.     Coram Alternate Site Services, Inc. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. Coram Alternate Site Services, Inc. holds three non-resident pharmacy licenses in Arkansas. Coram Alternate Site Services, Inc. is an indirect subsidiary of Caremark.

47.     CVS Caremark Advanced Technology Pharmacy, L.L.C. is located at 1780 Wall St., Mount Prospect, Illinois 60056. CVS Caremark Advanced Technology Pharmacy, L.L.C. holds a non-resident pharmacy license in Arkansas. CVS Caremark Advanced Technology Pharmacy, L.L.C. is an indirect subsidiary of Caremark.

48.     CVS Rx Services, Inc. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Rx Services, Inc. holds a non-resident pharmacy license in Arkansas. CVS Rx Services, Inc. is a direct subsidiary of CVS Pharmacy.

49.     Express Pharmacy Services of PA, LLC is headquartered at 620 Epsilon Drive, Pittsburgh, Pennsylvania 15238. Express Pharmacy Services of PA, LLC holds a non-resident pharmacy license in Arkansas. Express Pharmacy Services of PA, LLC is a subsidiary of Caremark.

50.     Holiday CVS, L.L.C. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. Holiday CVS, L.L.C. holds a non-resident pharmacy license in Arkansas. Holiday CVS, L.L.C. is a subsidiary of CVS Pharmacy.

51.     I.G.G. of America, LLC is located at 7150 Columbia Gateway Drive, Columbia, Maryland 21046. I.G.G. of America, LLC holds a non-resident pharmacy license in Arkansas. I.G.G. of America, LLC is an indirect subsidiary of Caremark.

52.    JHC Acquisition LLC is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. JHC Acquisition LLC holds a non-resident pharmacy license in Arkansas. JHC Acquisition LLC is an indirect subsidiary of CVS Pharmacy.

53.    NCS Healthcare of Kentucky, LLC is headquartered at 120 Carroll Knicely Drive, Glasgow, Kentucky 42141. NCS Healthcare of Kentucky, LLC holds a non-resident pharmacy license in Arkansas. NCS Healthcare of Kentucky, LLC is an indirect subsidiary of CVS Pharmacy.

54.    Pharmacy Consultants, LLC is headquartered at 111 Corporate Drive, Spartanburg, South Carolina 29303. Pharmacy Consultants, LLC holds a non-resident pharmacy license in Arkansas. Pharmacy Consultants, LLC is an indirect subsidiary of CVS Pharmacy.

55.    ProCare Pharmacy Direct, L.L.C. is located at 105 Mall Boulevard Monroeville, Pennsylvania 15146. ProCare Pharmacy Direct, L.L.C. holds two non-resident pharmacy licenses in Arkansas for various business segments. ProCare Pharmacy Direct, L.L.C. is a direct subsidiary of CVS Pharmacy.

56.    ProCare Pharmacy, L.L.C. is located at One CVS Drive, Woonsocket, Rhode Island 02895. ProCare Pharmacy, L.L.C. holds three non-resident pharmacy licenses in Arkansas for various business segments. ProCare Pharmacy, L.L.C. is a direct subsidiary of CVS Pharmacy.

57.    SilverScript Insurance Company is a Delaware corporation with its principal place of business at 1021 Reams Fleming Boulevard, Franklin, Tennessee 37064. SilverScript Insurance Company sponsors SilverScript Choice (PDP), a Medicare Part D plan. SilverScript Insurance Company is an indirect subsidiary of Caremark.

58.    Coventry Health and Life Insurance Company is a Missouri corporation with its principal place of business at 1285 Fern Ridge Parkway, Suite 200, St. Louis, Missouri 63141. Coventry Health and Life Insurance Company sponsors Aetna Medicare Dual Select Choice (PPO D-SNP), Aetna Medicare Dual Choice (D-SNP), Aetna Medicare Value Plus (PPO), Aetna Medicare Giveback Choice (PPO), Aetna Medicare Premier Plus (PPO), Aetna Medicare Elite (PPO), and Aetna Medicare Freedom (PPO), which are Medicare Advantage Prescription Drug plans. Coventry Health and Life Insurance Company is an indirect subsidiary of CVS Pharmacy.

59.    Coventry Health Care of Kansas, Inc. is a Kansas corporation with its principal place of business at 8401 Indian Creek Parkway, Suite 1300, Overland Park, Kansas 66210. The company sponsors Aetna Medicare Dual Signature Select (HMO D-SNP), Aetna Medicare Dual Signature (HMO D-SNP), and Aetna Medicare Dual Preferred (HMO D-SNP), which are Medicare Advantage Prescription Drug plans. Coventry Health Care of Kansas, Inc. is an indirect subsidiary of CVS Pharmacy.

60.    Coventry Health Care of Missouri, Inc. is a Missouri corporation with its principal place of business at 1285 Fern Ridge Parkway, Suite 200, St. Louis, Missouri 63141. The company sponsors Aetna Medicare Premier (HMO) and Aetna Medicare Signature (HMO), which are Medicare Advantage Prescription Drug plans. Coventry Health Care of Missouri, Inc. is an indirect subsidiary of CVS Pharmacy.

**B.    Defendants**

61.    The Arkansas State Board of Pharmacy (Board of Pharmacy) is an agency within the Arkansas Department of Health, with a principal place of business at 322 South Main Street, Suite 600, Little Rock, Arkansas 72201. The Board of Pharmacy's stated purpose is to promote, preserve, and protect the public health, safety, and welfare by and through the effective regulation of the many aspects of the drug delivery system. The Board of Pharmacy's stated

mission is to license, permit, and oversee pharmacists and pharmacies, as well as the distribution system for the sale, delivery, or distribution of prescription drugs.

62.    Rodney Richmond, Pharm.D.; Brian Jolly, Pharm.D.; Debbie Mack, P.D.; Lenora Newsome, P.D.; Clint Boone, Pharm.D.; Lyn Fruchey, Pharm.D.; Harold H. Simpson; and Beth Ann Davenport, Pharm.D. are the Board of Pharmacy's individual members, with a principal place of business at 322 South Main Street, Suite 600, Little Rock, Arkansas 72201. Each Board of Pharmacy member is being sued solely in his or her official capacity.

63.    John Kirtley, Pharm.D., is the Executive Director of the Board of Pharmacy, with a principal place of business at 322 South Main Street, Suite 600, Little Rock, Arkansas 72201. Kirtley is being sued solely in his official capacity.

64.    Defendants, and those subject to Defendants' supervision, direction, and/or control, are responsible for the implementation and enforcement of the Act.

### C.    A Justiciable Controversy Exists Between CVS And Defendants

65.    An actual case or controversy has arisen between the parties. The Act will become effective on January 1, 2026. Absent injunctive relief, CVS must take drastic steps to comply with the Act. There is no feasible corporate structure—absent CVS's complete corporate separation from Caremark—that can preserve CVS's ability to hold a pharmacy license in Arkansas. CVS has already taken preparatory steps to comply with the Act, and it cannot delay taking further steps given the complexity of unwinding CVS's business in Arkansas and the law's impending effective date.

## FACTS

### A.    Delivery Of Prescription Drug Benefits To Patients

66.    Multiple entities are involved in the process of getting prescription drugs into the hands of patients: (1) *drug manufacturers* research, develop, and bring drugs to market; (2) *drug*

*wholesalers* purchase drugs from the manufacturers and distribute them to pharmacies and healthcare providers; (3) *pharmacies* purchase drugs from wholesalers or directly from manufacturers and distribute them to pharmacy patients; (4) *PBMs* contract with their plan sponsor clients (including health plans, employers, unions, and government plans) to manage their prescription-drug benefits, with manufacturers to negotiate drug rebates, and with pharmacies to participate in pharmacy networks and process prescription claims; and (5) *plan sponsors* provide coverage for pharmacy services and prescription drug benefits and contract with PBMs for support in managing those benefits.

67.    Present-day pharmacies exist in multiple forms.    A "retail pharmacy" is a physical, brick-and-mortar store that dispenses prescription drugs, over-the-counter medications, and other healthcare products to members of the community.    At a retail pharmacy, patients generally collect their prescriptions in person.    Many retail pharmacies, like those operated by CVS, also sell goods like groceries and convenience items to customers.

68.    A "mail-order pharmacy" is a pharmacy that distributes prescription medications directly to patients by mail.    This can be a convenient and efficient pharmacy solution for patients with chronic conditions and can ensure the continuity of care for individuals who lack the ability to pick up their prescriptions in person at a retail pharmacy.    For many of these patients, who may suffer the most severe illnesses, access to mail-order pharmacies is especially critical.

69.    A "specialty pharmacy" is a pharmacy that provides prescription medications for patients with complex, serious, and potentially chronic health conditions.    Specialty medications are often more expensive and may require special handling.    In addition to dispensing those

medications, specialty pharmacies also provide other special services, such as comprehensive patient support and coordination of care.

70.    When a member of a PBM plan sponsor client uses a pharmacy to fill a prescription, the pharmacy interfaces with the PBM to determine coverage and any applicable copayment or other patient financial responsibility under the patient's benefit. The pharmacy will then fill the prescription using drugs it has purchased. Once the prescription is filled, the PBM reimburses the pharmacy at a predetermined rate plus the patient pay amount as set by the patient's benefit plan.

71.    PBMs, which are operated by CVS, Cigna, and United Healthcare, among others, provide a variety of services to help their clients manage their prescription drug benefits. One of those services is forming and maintaining pharmacy networks. Pharmacies contract with PBMs to be included in these networks. As part of this arrangement, the PBM designs and maintains the network and also negotiates competitive rates of reimbursement for pharmacies within that network based on the prescriptions they fill.

72.    Clients use PBMs to support the network design adopted in their benefit plans. Typically, these contracts require a certain number of covered retail pharmacies within a certain geographic range from the members. Clients can also decide to use a narrow network or a preferred network.    In these networks, participating pharmacies agree to take lower reimbursement because they anticipate receiving a greater volume of prescriptions. For a preferred network, the client creates a benefit design where the member copay is reduced to incentivize members to fill their prescriptions at preferred network pharmacies and allow plans to reduce their prescription drug costs. Pharmacies are often willing to join preferred networks

as a trade-off, accepting reduced reimbursement rates to attract a larger number of customer beneficiaries.

73.    In addition to maintaining pharmacy networks, PBMs negotiate rebates with drug manufacturers based on a percentage of drug costs. These rebates are then passed through to the PBM's clients according to the terms of a preexisting agreement between the PBM and the client. Not all client plans are the same. Each plan sponsor client decides what types of prescription drug benefits to offer its members. Some plans, for example, may prioritize lower out-of-pocket costs for beneficiaries, and may therefore opt for a more limited pharmacy network (or the use of a preferred network) comprised of lower-cost pharmacies willing to charge lower reimbursement rates in exchange for more volume to achieve that goal. By contrast, other plans may prioritize access to a broader array of pharmacy options for their members even if that means incurring higher costs.

74.    More than one million Arkansans receive prescription drug and other benefits through employer-sponsored health plans, and hundreds of thousands more are covered by publicly funded federal programs such as Medicare Advantage and Medicare Part D.

75.    A PBM's affiliation with a pharmacy—whether mail-order or brick-and-mortar—often brings greater efficiencies and reduced costs. This allows PBMs to generate cost savings that can be passed down to plan members.

76.    Approximately 40 PBMs compete with one another in Arkansas. Every single PBM-affiliated pharmacy in Arkansas that is affected by the law—due to the last-minute amendment by the Arkansas legislature—is also an out-of-state entity. More exactly, by CVS's count, there are 36 PBM-affiliated pharmacies in Arkansas that are affected by HB 1150,

including 23 CVS retail pharmacies and an Omnicare-operated pharmacy (which is affiliated with CVS).

77.     Pharmacies typically do not serve members of only one PBM—they usually participate in multiple networks through multiple PBMs. A typical CVS pharmacy, for instance, participates in networks managed by over 40 other PBMs—including Express Scripts and OptumRx, Caremark's two largest competitors—and negotiates contracts with all of those PBMs, just like other pharmacies do.

78.     Pharmacies compete with each other for customers and network participation through price, customer service, and other offerings. When CVS succeeds in the market, that is in part because it is offering *lower* prices than competitors.

79.     Nationwide, the balance between chain and independent pharmacies has remained relatively stable in recent years. Indeed, there are more independent pharmacies operating today than there were in 2007. The National Council for Prescription Drug Programs (NCPDP) is a not-for-profit, standards development organization with over 1,500 members across the pharmacy services industry. NCPDP maintains dataset tracking of real-world pharmaceutical data that is relied upon for claims processing within the healthcare system and for other purposes. NCPDP's data reflects that between 2007 and 2021, there was a 13.5% increase in the number of independent pharmacies nationwide. The growth of independent pharmacies has been particularly pronounced in metropolitan areas, where numbers increased by 26.5% between 2008 and 2021.

80.     Data maintained by the National Community Pharmacists Association (NCPA) also shows that independent pharmacies' gross margins and market share have remained relatively stable between 2007 and 2021. NCPA data shows that as of 2022, independent

pharmacies nationwide accounted for 34% of all retail pharmacies—far larger than any individual PBM-affiliated pharmacy.

### B.    CVS's Arkansas Operations

81.    CVS currently operates 23 retail pharmacies in Arkansas, which collectively employ more than 500 Arkansans. These 23 pharmacies operate in every corner of the state and serve both urban and rural markets. In 2024, these retail locations filled more than 2.4 million prescriptions for more than 340,000 patients.

82.    Under Arkansas law, a retail pharmacy must maintain a "resident" pharmacy permit, which is administered by the Board of Pharmacy. Retail pharmacies must comply with Arkansas laws and regulations governing pharmacy services as a condition of permitting. Ark. Code Ann. § 17-92-101. All 23 CVS retail pharmacies maintain resident pharmacy permits to provide pharmacy services in Arkansas. The permits for all CVS retail pharmacies in Arkansas are held by Arkansas CVS Pharmacy, LLC, which operates all CVS retail stores in the state.

83.    CVS also offers mail-order pharmacy services in Arkansas. CVS's mail-order pharmacy operations are not located in Arkansas. Instead, all pharmaceutical products delivered through CVS's mail-order business to Arkansas residents are shipped into the state from pharmacies situated in three other States across the country. The decision whether to use a mail-order pharmacy is at the discretion of a plan sponsor.

84.    Arkansas law requires mail-order pharmacies based outside the state to maintain a "non-resident" pharmacy license in order to ship medications into the state. *See* Ark. Code Ann. § 17-92-401. Mail-order pharmacies must also comply with applicable state law as a condition of maintaining their non-resident pharmacy licenses. *Id.* Multiple corporate entities make up CVS's mail-order business, and each distinct entity holds its own non-resident license.

85.    CVS also operates one long-term care pharmacy through its affiliate Omnicare in Arkansas.  The Omnicare pharmacy, like CVS's retail pharmacies, holds a resident pharmacy permit and must comply with Arkansas laws and regulations governing pharmacy services.  Ark. Code Ann. § 17-92-101.  Omnicare provides specialized pharmacy services to patients in long-term care and skilled nursing facilities in Arkansas.  These patients typically are Medicare beneficiaries who suffer from chronic or complex diseases requiring special services that cannot be provided by other retail or mail order pharmacies.

86.    To the extent a CVS retail or mail-order pharmacy dispenses specialty medications, Arkansas law requires that the pharmacy also hold a separate permit authorizing it to fill specialty prescriptions.  Ark. Code Ann. § 17-92-403; Code Ark. R. 007.39.4-04-03-0001. This permit similarly requires CVS pharmacies to comply with applicable state law.  *See id.*

87.    Without the necessary resident or non-resident permits or licenses, CVS pharmacies would be categorically precluded from dispensing medications in the State.

88.    Arkansas law also requires that PBMs maintain a license to operate in the state, which Caremark does.  Ark. Code Ann. § 23-92-504.  As a condition of its license, Caremark must abide by Arkansas laws and regulations that govern not only its conduct as a PBM generally, but also its interactions with pharmacies.  Among other things, those conditions forbid Caremark from reimbursing its affiliated pharmacies at higher rates than its reimbursement rate for independent pharmacies.  Ark. Code Ann. § 17-92-507.

89.    To guard against the risk that any conflict of interest may influence negotiations between Caremark and its affiliated pharmacies, CVS employs a stringent corporate firewall policy that preserves separate and independent decision making by the companies.  Thus, when

Caremark and a CVS retail pharmacy negotiate reimbursement rates, they act at arm's length and the affiliated pharmacy does not receive preferential treatment.

90.    Indeed, Caremark reimburses non-CVS-affiliated pharmacies at a higher rate than CVS retail pharmacies.  Across all prescriptions filled in Arkansas, Caremark reimbursed non-affiliated pharmacies at a higher percentage of the medications' National Drug Acquisition Cost (NADAC) than Caremark's affiliated pharmacies received.  For brand drugs, Caremark reimbursed its affiliated pharmacies *below* the NADAC price, while non-affiliated pharmacies were reimbursed at rates *above* the NADAC price.  Nor is this story an anomaly. Across the nation, pharmacies affiliated with the three largest PBMs—Caremark, Express Scripts, and Optum Rx—are reimbursed roughly 3.5% less for branded drugs and about 19.3% less for generic drugs than independent pharmacies.

91.    The vast majority of Caremark's reimbursements in Arkansas go to non-affiliated pharmacies rather than CVS pharmacies.  In total, 752 Arkansas pharmacies are in-network for Caremark, many of which are independent or regional-chain pharmacies.  The sum total of Caremark's reimbursement of CVS pharmacies in Arkansas in 2022 was approximately $76.8 million, for example.  Independent pharmacies in Arkansas were reimbursed over $1.033 *billion* by Caremark that year—more than *thirteen times* more.

### C.    The Act's Sweeping Prohibition On PBM-Affiliated Pharmacies

92.    HB 1150, if it goes into effect, will expel virtually all PBM-affiliated pharmacies (including all CVS-affiliated pharmacies and many mail-order pharmacies) from operating in Arkansas.

93.    Section 1 of the Act recites the General Assembly's legislative findings and intent. This preamble leaves no doubt about the Act's goal of protecting local pharmacies.  The legislative findings justified the State's brazen protectionism by asserting that PBM-affiliated

pharmacies have employed "anticompetitive business tactics" to "drive[] locally-operated pharmacies out of business" and that these alleged tactics have limited patient choice and inflated drug prices. The findings assert that the law will eliminate these tactics by prohibiting PBMs from serving as "both a price setter and a price taker."

94.     Section 2 of the Act adds two new sections to Title 17 of the Arkansas Code. The first, Ark. Code Ann. § 17-92-416, describes the new limitations that will be placed on the availability of pharmacy permits in the state, and the second, Ark. Code Ann. § 17-92-417, outlines related notice requirements.

95.     The Act provides that "[a] pharmacy benefits manager shall not acquire a direct or indirect interest in, or otherwise hold, directly or indirectly, a permit under § 17-92-405 for the retail sale of drugs or medicines in this state," and requires that the Board of Pharmacy "shall either revoke or not renew a permit of an entity that violates this section" after the Act goes into effect on January 1, 2026. Ark. Code Ann. § 17-92-416(b), (c). The Act defines the term "permit" to mean a permit issued under § 17-92-40, and specifies that the term includes a mail-order pharmacy license. Ark. Code Ann. § 17-92-416(a)(1). The Act defines "pharmacy benefits manager" to have the same meaning as in § 23-92-503, and specifies that the term "includes an entity that: (i) Is managed by a pharmacy benefits manager or is a subsidiary of a pharmacy benefits manager; or (ii) Has a direct or indirect ownership interest in a pharmacy benefits manager." *Id.* § 17-92-416(a)(2).

96.     The Act provides the Board of Pharmacy with temporary authority (set to expire on September 1, 2027) to "issue a limited use permit for certain rare, orphan, or limited distribution drugs that are otherwise unavailable in the market to a patient or a pharmacy that would otherwise be prohibited under this section," and permits the Board of Pharmacy to "assess

the need for rare, orphan, or limited distribution drugs for a limited use permit … before revocation or renewal of an existing retail permit for a pharmacy." Ark. Code Ann. § 17-92-416(d)(1), (2)(A)(i), (3)(A).  If the Board of Pharmacy "determines that a rare, orphan, or limited distribution drug is otherwise unavailable in the market to a patient or pharmacy that would otherwise be prohibited in this section, the board shall convert the retail permit for the prohibited pharmacy to a limited use permit for that pharmacy for a period of no less than ninety (90) days." *Id.* § 17-92-416(d)(2)(B).

97.     The Act also authorizes the Board of Pharmacy to "extend the use of a retail permit or issue a renewal of a retail permit for a pharmacy that offers same-day patient access for pharmacist services, a prescription for a controlled substance, mental health services, or other critical patient healthcare services for a period of time as determined by the board if there is a pending sale of the pharmacy to an eligible buyer." *Id.* § 17-92-416(e).

98.     The Act includes a significant carve-out from § 17-92-416's licensing prohibitions, specifying that they "do[] not apply to a pharmacy employer and a pharmacy that: (1) Has direct or indirect interest in a pharmacy benefits manager; (2) The pharmacy employer is the sole Arkansas client of the pharmacy benefits manager that the pharmacy employer has a direct or indirect interest in; and (3) Exclusively services the employees and dependents of the pharmacy employer while utilizing the affiliated pharmacy benefits manager in this state." *Id.* § 17-92-416(f).

99.     Section 17-92-417 requires the Board of Pharmacy to "conduct an initial assessment of each active retail pharmacy permit that was issued under § 17-92-405 as of July 1, 2025," and to "send written notice to each pharmacy permit holder that the board reasonably believes will violate § 17-92-416 at least ninety (90) days before January 1, 2026." *Id.* § 17-92-

417(a)(1).  The notice "shall include: (1) A list of each pharmacy benefits manager that holds a direct or indirect interest in, or otherwise holds, directly or indirectly, a permit under § 17-92-405 for the retail sale of drugs or medicines in this state held by the pharmacy permit holder; (2) A phone number and email address that is monitored by the board during regular business hours; and (3)(A) A list of Arkansas pharmacies that hold an active retail pharmacy permit that are not reasonably expected to violate § 17-92-416 as of January 1, 2026." *Id.* § 17-92-417(b).

100.    The Act further requires that any permit holder that receives such a notice from the Board of Pharmacy "shall provide written notice at least sixty (60) days before January 1, 2026, to each patient and each patient's prescribing healthcare provider that has used the pharmacy within the previous twelve (12) months that the pharmacy can no longer dispense retail drugs to the patient on or after January 1, 2026." *Id.* § 17-92-417(c).

**D.    The Act's Discriminatory And Punitive Purpose**

**1.    Lawmakers' and Interest Groups' Statements Reflect the Act's Protectionist Aims and Anti-CVS Bias**

101.    HB 1150's statutory and legislative context makes crystal clear that the law was engineered to protect local pharmacy interests from competition with out-of-state pharmacies, like CVS.  Indeed, the public record alone is full of statements by Arkansas lawmakers and other proponents of HB 1150 stating in unequivocal terms that this bill was designed to protect home-state pharmacies.  HB 1150's critics also recognized that the battle lines were drawn around whether Arkansas should enact conspicuously protectionist measures.

102.    On January 16, 2025, lawmakers, the attorney general, and interest groups held a press conference at the Arkansas State Capitol to announce HB 1150, which had been recently introduced in the House.  At this public roll-out, the bill's advocates spoke in no uncertain terms about how they hoped HB 1150 would tilt the playing field in favor of in-state pharmacies.

Representative Jeremiah Moore, one of the bill's co-sponsors, warned Arkansas residents that their "neighborhood pharmacies are closing at a rapid pace," and the new bill was aimed at curbing those closures. Monique Whitney of Pharmacists United for Truth & Transparency, supporting the statements of Representative Moore and other officials, likewise explained that the bill would "ensure local pharmacies can remain open and accessible to their communities. It's a win for patients and local pharmacies."[2]

103.    While the bill was making its way through the amendment process, lawmakers continued to trumpet the bill's protectionist policies. For example, the Jonesboro Sun reported on March 17, 2025 that Senator Dan Sullivan described the bill as "protect[ing] competition so local pharmacies can keep serving their communities."[3] The White County Citizen reported on March 27, 2025 that Representative Jim Wooten, a bill co-sponsor, said the bill "really pinpoints and identifies the troublemakers causing the problem for your local pharmacists."[4] The subtext, of course, was that the "troublemakers" included out-of-state pharmacies that were competing to provide Arkansans with cheaper prices and more convenient services.

104.    These protectionist aims were echoed repeatedly in committee hearings and floor sessions about the bill. In a House Insurance and Commerce Committee hearing on April 2,

---

[2]    *PUTT: Arkansas' New Bill to Ban PBM-Owned Pharmacies From Operating In State is "A Win,"* KRON4 (Jan. 17, 2025), https://www.kron4.com/business/press-releases/ein-presswire/777912337/putt-arkansas-new-bill-to-ban-pbm-owned-pharmacies-from-operating-in-state-is-a-win/.

[3]    Dan Sullivan, *HB 1150 Puts Pharmacy Patients, Quality Care First*, Jonesboro Sun (Apr. 16, 2025), https://www.jonesborosun.com/opinion/hb1150-puts-pharmacy-patients-quality-care-first/article_4e4dbf12-1358-592d-a59f-3e4fbc9afb43.html.

[4]    Greg Geary, *Small pharmacies in danger of closing if PBM bill doesn't pass, state representative says*, White Cnty. Citizen (Mar. 27, 2025), https://www.whitecountycitizen.com/news/small-pharmacies-in-danger-of-closing-if-pbm-bill-doesnt-pass-state-representative-says/article_aeb90ec0-5a9f-5236-9c13-62c04edcbab0.html.

2025, Representative Robin Lundstrom expressed concerns that out-of-state pharmacies affiliated with PBMs were jeopardizing "the small-town pharmacists." As evidence, she pointed out that even large Arkansas-based pharmacy operators like Walmart and Harps Food were struggling to compete with the out-of-state national chains. According to Representative Lundstrom, the "little guy's got no chance at all if the big guys are getting beat up." Representative Richard McGrew echoed those concerns, suggesting that the local pharmacies he spoke with in his district would be forced out of business if Arkansas did not intervene. Representative Les D. Eaves similarly announced that everyone knew what PBMs were "doing to our rural pharmacies."

105.    One of HB 1150's co-sponsors, Representative Moore, explained that the law would pursue "justice for patients, taxpayers, and local pharmacies."

106.    John Vinson, the CEO of the Arkansas Pharmacist Association, testified at the hearing that a "free market" should give patients "local access" at independent pharmacies, as well as larger chains such as Walgreens and Walmart. He said he hoped HB 1150 would bring back all the independent pharmacies that the community has lost. Prior to the hearing, Vinson also expressed concern that the law needed to clamp down on CVS in particular: "I don't see a scenario where any pharmacy … is ever going to get a fair contract as long as CVS can steer and fill those prescriptions at their own pharmacy."

107.    Just before the April 3, 2025 House floor session on the bill, the White County Citizen reported that Representative Wooten said the legislation was needed to keep small,

independent pharmacies from closing.[5]  In the same article, Senator Jonathan Dismang was quoted acknowledging that the bill, as it was originally drafted, was flawed because it would have prevented Arkansas-based Walmart and other such entities from operating pharmacies.

108.    During the April 3 floor session, Representative Brandon Achor, one of the bill's most vocal proponents—and who personally owns 13 of the independent pharmacies in Arkansas that the Act will benefit[6]—framed the bill as a means of protecting local pharmacies just like his own, which he described as "exceptionally at risk."  Representative Joey Carr similarly described his discussions with worried local pharmacies, who felt they were "on the brink of going out of business."

109.    During an April 8, 2025 Senate Insurance and Commerce Committee hearing on the bill, Senator Kim Hammer, another bill co-sponsor, proudly explained that the bill "gives patients the option to fill prescriptions at their local community pharmacy or even at their local hospital pharmacy," the types of "places where the pharmacist actually knows them."

110.    During the Senate floor session the following day, Senator Hammer warned that if lawmakers "don't do something" then more and more independent pharmacies would be "put out of business under the current structure."

111.    Lawmakers and witnesses opposing the Act's passage likewise acknowledged—but criticized—the Act's obvious protectionist aims.  During the April 2 House Insurance and Commerce Committee hearing, Randy Zook, testifying on behalf of the Arkansas Chamber of

---

[5]    Steve Watts and Wendy Jones, *State legislators from White County discuss challenges PBMs bill faces despite finally making it out of committee*, White Cnty. Citizen (Apr. 3, 2025), https://www.whitecountycitizen.com/news/state-legislators-from-white-county-discuss-challenges-pbms-bill-faces-despite-finally-making-it-out/article_92b5b2a9-ca9d-55fe-bffd-c93d1af9a25c.html.

[6]    Michael R. Wickline, *State Rep. Brandon Achor, R-Maumelle, announces state Senate run*, Ark. Online (May 7, 2025), https://edition.arkansasonline.com/article/281835764583554.

Commerce, warned that the bill would "unjustly" punish pharmacies who made "good-faith business investments in our state," and recognized that the bill was really about "using the government to ensure or increase market share" for local pharmacies.

112.    At the April 8, 2025 hearing of the Senate Insurance and Commerce Committee, Senator Missy Irvin denounced HB 1150 as an abuse of the state's licensing power to get rid of national competition for the benefit of in-state pharmacies. She criticized the Act for improperly picking "winners and losers" in an "anti-competitive way" by "deny[ing] a business" the opportunity "to operate" altogether.

113.    At that hearing, Zook characterized the bill as "a punitive measure to remove competition from the market" despite companies' "good faith business investments in our state."

114.    In response, Senator Mark Johnson, who supported HB 1150, said that he was "literally shocked" and "flabbergasted" that the Arkansas Chamber of Commerce would support national pharmacies despite the organization's traditional "support" for "our local businesses around the state."

115.    Statements by lawmakers after the bill was introduced also show that its supporters sought to generate public support for the law by emphasizing its twin goals of protecting local pharmacy interests while driving CVS out of the State.

116.    At the January 16 press conference announcing the bill, Representative Moore said that if the PBMs "had it their way, Arkansas patients would be forced to get their medications from either a mail-order pharmacy or a big box store such as CVS. As someone who represents a dozen pharmacies in his house district, not one being a CVS, this is untenable." At the same conference, Loretta Boesing, Executive Director of United for Safe Medications,

complained that her own family was "forced away from our trusted pharmacy into mail-order pharmacy, it was CVS Specialty Pharmacy."

117.    On February 3, some of the bill's co-sponsors and other proponents joined a podcast to discuss and garner support for the bill. Representative Achor said that he "love[d] that this is not a negotiation" with the PBM-affiliated pharmacies that the bill targeted, because they have "shown [they] have no remorse." Senator Hammer distinguished between "local independent pharmacies" that are "investing in their communities" and are "there for the long haul," and CVS, which, in his view, "pull[s] out" based on financial considerations, "sucking the economy out" of Arkansas and "sending it somewhere else."

118.    Before the April 3 House floor session, Representative Eaves acknowledged the Act would inevitably lead to the closure of CVS pharmacies across Arkansas and the loss of hundreds of jobs. While Representative Eaves said he "didn't sign up for constituents to lose their jobs," he nevertheless accepted those consequences with his vote in favor of the bill.[7]

119.    Representative Achor blasted the PBMs he felt were threatening the viability of his own pharmacies. He maintained that these out-of-state companies had "no respect for this body, for this state."

120.    At the April 8 Senate Insurance and Commerce Committee hearing, Senator Hammer criticized CVS for "kick[ing] out of town" in his area, and applauded "local pharmacies" for "pick[ing] up the slack." Although he gave the "lion's share of credit to the

---

[7]    Steve Watts and Wendy Jones, *State legislators from White County discuss challenges PBMs bill faces despite finally making it out of committee*, White Cnty. Citizen (Apr. 3, 2025), https://www.whitecountycitizen.com/news/state-legislators-from-white-county-discuss-challenges-pbms-bill-faces-despite-finally-making-it-out/article_92b5b2a9-ca9d-55fe-bffd-c93d1af9a25c.html.

independent pharmacies," Senator Hammer also credited "local pharmacies" like Walmart, who "stayed committed to their area."

121.    The next day, Senator Hammer appealed to the full Senate, arguing the bill would ensure Arkansans have access to providers who care about more than just the financial bottom line and do not "pull out when profits drop, like CVS did" in his district.

122.    Senator Jim Petty, after stating he "would never want to put anybody out of business intentionally," argued that he's already seen "local community pharmacies close" and suggested CVS had been closing a number of locations nationally as part of a strategic plan anyway. "And that's why I will be voting yes for HB 1150," he concluded.

123.    Lawmakers and witnesses opposing the bill called attention to HB 1150's intended impact on CVS. At the April 2 House Insurance and Commerce Committee hearing, Sharon Faust, Chief Pharmacy Officer for Navitus Health Solutions, warned that dozens of pharmacies would be "run out of business" as a direct result of the bill. Representative Carol Dalby warned that her district might become a pharmacy desert, since it had only three pharmacies, and one of those pharmacies would lose its permit under the Act.

124.    At the April 3 House floor session, Representative Brit McKenzie attempted to sympathize with lawmakers supporting the bill, explaining that he also "detest[ed] PBMs." But he cautioned that the Act would not solve the problem it purported to solve, calling it a "Band-Aid on a flesh wound."

125.    At the April 9 Senate floor session, Senator Irvin criticized advocates for the bill for enlisting the government's help in "put[ting] [their] competition"—like CVS—"out of business." She added, "that's exactly what this bill does. It takes their ball away."

126.    Senator Fredrick Love echoed Senator Irvin's concerns: "Now we're going to say we're going to put pharmacies out of business? You all, we really have to consider what we're doing. And maybe you all do have local pharmacies and good for your communities, but I don't have any local pharmacies and my people need CVS." Senator Love further cautioned that the law would "put[] people out of work" and "disenfranchis[e] people that really need their medicine."

127.    After signing the Act into law on April 16, 2025, Governor Sarah Huckabee Sanders issued a press release touting the support of the attorney general, the bill's sponsors, other lawmakers, and local pharmacy owners and advocates.[8] Lynn Wilson, a local pharmacy owner, applauded the "state government and [] Governor Sarah Sanders for protecting Arkansans' rights to local pharmacy services." Blake Torres, another local pharmacy owner, described the bill as a "win for local business." And Caroline Myers Kitchens, a pharmacist at a local pharmacy, lauded the bill for guaranteeing that "locally owned, independent pharmacies will be able to remain operational."

128.    Media coverage reflected the legislature's desire to kick CVS and other national pharmacies out of the State. One article, entitled *Sanders signs bill to strip CVS and other PBMs of pharmacy licenses in Arkansas*, quoted Governor Sanders: "These massive corporations are attacking our state because we will be the first in the country to hold them accountable for their

---

[8]    Press Release, Sanders Signs Legislation to Ban Anti-Competitive PBM Practices, (Apr. 16, 2025), https://governor.arkansas.gov/news_post/sanders-signs-legislation-to-ban-anti-competitive-pbm-practices.

anticompetitive actions, but Arkansas has never been afraid to be a conservative leader for America."[9]

129.    In the aftermath of the Act's passage, the Arkansas Pharmacists Association made several posts on its social media accounts with the hashtags "#SupportLocalPharmacies" and "#ProtectLocalPharmacy." One Pharmacists Association post celebrated Governor Sanders for "sending a clear message" to PBMs and holding them accountable for practices that allegedly "hurt local pharmacies."[10]

### 2.    The Evolution of HB 1150 Further Illustrates that the Act's Objective Is to Punish CVS and Out-of-State Competitors While Leaving Arkansas-Based Pharmacy Businesses Untouched

130.    The evolution of HB 1150 underscores its protectionist objectives and lawmakers' desire to specifically target and punish CVS.

131.    As originally proposed, HB 1150 would have made licenses unavailable to pharmacies affiliated with any "healthcare payor," defined as "an entity that contracts, pays, or arranges for payment, in whole or in part, for the delivery of healthcare services or products that are covered by a health benefit plan administered, issued, or delivered by the entity or individual." Ark. Code Ann. § 23-79-2002(2)(A). But this broad "healthcare payor" language would have captured any Arkansas pharmacy that sponsors a self-funded health plan—including most prominently Walmart.

132.    Many lawmakers balked at supporting HB 1150 in its original form because of its predicted impact on Walmart. Indeed, the bill languished in the Arkansas House Committee on

---

[9]    Benjamin Hardy, *Sanders signs bill to strip CVS and other PBMs of pharmacy licenses in Arkansas*, Ark. Times (Apr. 16, 2025), https://arktimes.com/arkansas-blog/2025/04/16/sanders-signs-bill-to-strip-cvs-and-other-pbms-of-pharmacy-licenses-in-arkansas.

[10]    *See* Arkansas Pharmacists Ass'n (@arkpharm), Instagram (Apr. 19, 2025), https://www.instagram.com/p/DIm5AmWKsa6.

Insurance & Commerce for nearly three months before a series of amendments—including one that would carve out an exemption for Walmart—revived its political fortunes. Senator Jonathan Dismang, for example, stated that he could not support the bill because it would have prevented businesses like Walmart from operating pharmacies. But State Representative Wooten, who voted in favor of HB 1150, sought to assuage such concerns by pointing out that "they got that corrected" by amending the law.

133.    Senator Dismang's solicitude for Walmart was widely shared by his colleagues. Walmart is the largest employer in the world with 2.1 million employees. Nearly 60,000 Arkansans work for Walmart, and the company is the largest business in the State by an order of magnitude.

134.    As amended, there is no longer any concern that the Act will prohibit Walmart from operating its pharmacies in Arkansas. That is because the Act contains a tailored exemption for pharmacies where the PBM serves only the pharmacy's own employee benefit plan in Arkansas. *See* Ark. Code Ann. § 17-92-416(b), (c). The amendment to HB 1150 thus functioned to shield Arkansas-based businesses from the Act's licensing restrictions by redrawing the lines to encompass only out-of-state competitors like CVS.

### E.    The Pre-Existing Arkansas Prohibitions On Unfair Competition Render The Professed Benefits Of The Act Illusory

135.    The Act's stated purpose is to prevent PBMs from giving affiliated pharmacies preferential treatment relative to local pharmacy competitors. But there are two problems with that account. For starters, as mentioned before, the average PBM actually tends to give more preferable rates to *non-affiliated* pharmacies rather than its own affiliates, and Caremark reimburses independent pharmacies at a higher rate than its own affiliated pharmacies. And in any event, Arkansas already has several statutes on the books that regulate the rates at which

PBMs must reimburse pharmacies for prescriptions delivered to Arkansans, including a law that expressly prohibits PBMs from paying higher reimbursement rates to affiliated pharmacies than to unaffiliated pharmacies.

136.    In recent years, the legislature enacted several laws that guarantee local independent pharmacies' reimbursement levels for prescription drugs in excess of their costs of acquiring drugs from wholesale sources.

137.    The State's restraints on pharmacy pricing and reimbursement practices by PBMs have three principal features.  First, Arkansas law requires PBMs to reimburse pharmacies at prices equal to or greater than the pharmacies' invoiced costs for the drugs from their wholesalers.  Ark. Code Ann. § 17-92-507(a)(6) (defining "pharmacy acquisition cost" as "the amount that a pharmaceutical wholesaler charges for a pharmaceutical product as listed on the pharmacy's billing invoice").  Second, Arkansas law requires PBMs to permit pharmacies to administratively appeal reimbursement decisions.  *See generally* Ark. Code Ann. § 17-92-507(c)(4).  If the appeal is upheld, the PBM must increase the reimbursement amount; if the appeal is denied, the PBM must still facilitate the pharmacy's efforts to obtain the drug at a lower cost.  Ark. Code Ann. § 17-92-507(c)(4)(C).  Third, Arkansas law affords pharmacies the right to refuse to dispense any prescription "if, as a result of a Maximum Allowable Cost List, a pharmacy or pharmacist is to be paid less than the pharmacy acquisition cost of the pharmacy providing pharmacist services."  Ark. Code Ann. § 17-92-507(e).

138.    In 2018, the Arkansas Legislature supplemented these background protections for independent pharmacies in the state by enacting Senate Bill 2, called the Arkansas Pharmacy Benefits Manager Licensure Act.  This law directly prohibits PBMs from favoring affiliated pharmacies over unaffiliated pharmacies when it comes to reimbursement, by providing that a

PBM may not "[r]eimburse a pharmacy or pharmacist in the state an amount less than the amount that the pharmacy benefits manager reimburses a pharmacy benefits manager affiliate for providing the same pharmacist services." Ark. Code Ann. § 23-92-506(b)(4)(A); *see* Ark. Code Ann. § 17-92-507(d)(1). This legislation directly addressed the "fox guarding the henhouse" concern described in HB 1150's preamble—*i.e.*, that PBMs, as both price-setter and price-taker, are in a position to give affiliated pharmacies preferential financial treatment relative to local pharmacy competitors.

139.    The existence of those laws means that the Act's purported purpose of "minimiz[ing] conflicts of interest" between PBMs and pharmacies is necessarily pretextual. Arkansas law already prohibits the type of differential treatment that HB 1150 is supposedly meant to address.

### F.    The Effect Of The Act On CVS's Pharmacy Operation And The Patients It Serves

140.    All of CVS's pharmacies in Arkansas are direct or indirect affiliates of Caremark and CVS Health.

141.    Under the Act's sweeping definition of a PBM, CVS Health, which is the ultimate parent of licensed PBM Caremark, itself qualifies as a PBM, and thus at least one entity defined as a "PBM"—CVS Health—has a direct or indirect interest in each of the Arkansas pharmacy permits and licenses CVS and its affiliates hold, whether for retail, mail-order, or specialty pharmacy services.

142.    The Act will force CVS to either close or sell all 23 of its retail pharmacy locations in the State of Arkansas. In 2024 alone, those retail pharmacies served more than 340,000 patients, filling more than 2.4 million prescriptions.

143.    The Act will also force the closure or sale of the retail locations altogether—not just the pharmacy operations. That is because CVS's retail business model depends on the pharmacy business to drive foot traffic to its retail stores.

144.    These pharmacy closures also would come at a critical time. Pharmacies play an indispensable and central role in public health because they are uniquely positioned to provide care to local communities that are underserved by other kinds of health care providers. Moreover, in a time of growing distrust and disinformation, Americans from all walks of life view pharmacists as a particularly trustworthy source of information about health care, and many depend on their local pharmacy for accessible and high-quality care. For example, patients rely on pharmacists for in-person and telephonic education about their diseases and counseling on medications, including how to take them, common side effects, and improving medication adherence, which is especially important for patients taking certain specialty medications. Pharmacists also administer important immunizations to protect against common, preventable diseases like influenza and RSV. And pharmacists also can help advise patients on how to save money on their prescriptions too.

145.    The Act will also require CVS to cease its mail-order pharmacy operations in the state. Members elect to fill their prescriptions by mail for a variety of reasons including capacity, cost, or convenience. Some members may not be able to travel to a physical pharmacy to fill their prescriptions. Some may live too far to fill a prescription; others may be unable to travel any distance because of physical or medical limitations. Other members might elect to use the mail-order pharmacy because it is more affordable than filling a prescription at a retail pharmacy. And many members simply enjoy the convenience of having their prescription delivered to their front door. Mail-order fulfillment also promotes patient adherence to

pharmaceutical care, and some plan sponsors may choose to encourage or require the use of mail-order fulfillment.

146.    In 2024, Caremark filled over 278,000 mail-order prescriptions that were delivered to more than 20,000 patients in Arkansas, including over 5,000 covered by Medicare. On information and belief, Caremark handles approximately 40% of the mail-order pharmacy business in Arkansas, but the six largest PBMs in the country—Caremark, Express Scripts, Optum Rx, Humana Pharmacy Solutions, MedImpact, and Prime Therapeutics—all offer mail-order services in the State.  And each of these companies is based outside of Arkansas.

147.    In particular, Caremark neither maintains nor operates any of its mail-order pharmacy facilities in Arkansas.  Caremark fills 100% of Arkansas mail-order prescriptions from its out-of-state facilities and uses common carriers to transport the prescriptions into Arkansas.

148.    Because the large mail-order pharmacies the Act affects are integrated with PBM services, there is no corporate structure that would allow national mail-order pharmacies to continue to fill prescriptions in the state.  If the Act goes into effect, the majority of the mail-order pharmacy market will have to cease operations in Arkansas altogether.

149.    The Act will accordingly eliminate Caremark's mail-order business into Arkansas, as well as the business of other mail-order pharmacies to whom the Act applies.  Thus, by effect and design, the law will create a vacuum for in-state companies to fill at the expense of the out-of-state companies.

150.    The Act will likewise eliminate CVS's specialty pharmacy operations in Arkansas.  For patients with complex and chronic conditions who require a specialty medication with special handling or administration, pharmacists play a particularly sensitive role.  They provide personalized support to patients, and often coordinate closely with care teams, including

41

nurses, doctors, and care managers to answer questions, monitor treatment, and provide resources to support the patient and help them manage their condition.

151.    In 2024, CVS filled over 70,000 prescriptions for specialty medications for more than 10,000 patients in Arkansas. Among those prescriptions, more than 24,000 (roughly 35%) were for limited distribution drugs (LDDs)—specialty medications only distributable by select pharmacies that satisfy the drug manufacturers' stringent requirements. Given its specific expertise in the handling and administration of specialty medications, CVS is also the exclusive distributor of 12 specialty medications, meaning they are currently unavailable through other specialty pharmacies. Some of the specialty medications CVS distributes are available exclusively through its mail-order pharmacies.

152.    CVS will no longer be able to distribute these specialty medications in Arkansas once the Act takes effect, absent the Board of Pharmacy's grant of a "limited use permit" under Section 2(d)(1). But any permit, if offered, will be temporary, expiring no later than September 1, 2027. Moreover, while manufacturers can often approve alternative or additional pharmacies to distribute specialty medications, not every pharmacy offers the training, administration, monitoring, adverse effect reporting, and 24/7 pharmacist services that manufacturers typically require to dispense these medications. Nor can every pharmacy meet the FDA Risk Evaluation and Mitigation Strategies program requirements that apply to certain LDDs. Not every pharmacy is willing or able to carry specialty medications given their relatively high carrying costs.

153.    Many of the patients affected by the closure of CVS's retail, mail-order, and specialty pharmacy operations are Medicare and Medicaid plan participants. In 2024, CVS served an estimated 41,000 Medicare beneficiaries, including 16,900 Medicare beneficiaries in

Arkansas. CVS also filled approximately 5,400 and 1,400 prescriptions for LDDs for Medicare and Medicaid beneficiaries in Arkansas, respectively—around 28% of all LDD prescriptions it filled in the state.

154.    The impact of these changes on CVS, its employees, Caremark's clients, and the patients they serve will be substantial. The closure of CVS's Arkansas retail pharmacy locations alone will result in an estimated loss of more than $200 million in annual revenue and $15 million in net income. The net income loss grows to over $70 million when including asset impairment. All other dispensing channels, like mail-order, Specialty, Omnicare, and Coram, will face an annual impact of at least $600 million in revenue and $40 million in operating income. All told, CVS estimates that the Act will cost CVS at least $110 million from asset impairment and annual loss of income.

155.    The closure of CVS pharmacy operations in Arkansas will hurt communities across the State. CVS's retail locations in Arkansas employ more than 500 employees that will lose their jobs if CVS is forced to close those stores. And the ripple effects of this law will reach far beyond CVS's employees. Each of the more than 340,000 Arkansans who rely on CVS retail pharmacies to fill prescriptions in 2024 will face the disruption of being told they need to secure pharmacy services elsewhere going forward. The same is true of the more than 20,000 patients that relied on Caremark's mail-order pharmacy service to deliver their prescription drugs to them in Arkansas in 2024 (including more than 5,000 individuals covered by Medicare), and the more than 10,000 patients that used CVS's specialty pharmacy in Arkansas in 2024.

## G.    The Act Benefits Locally Operated Pharmacies

156.    Just as intended, the Act will bestow huge benefits on "locally-operated pharmacies" to the detriment of out-of-state actors who will have their pharmacy permits cancelled. The benefits to local pharmacies are obvious. With all CVS pharmacy operations

expelled from the state, hundreds of thousands of retail patients will be looking elsewhere to fill millions of prescriptions every year. Mail-order customers in Arkansas with no adequate mail-delivery alternatives will be forced to find altogether new sources for medications. Local pharmacies, which remain unaffected by the Act, will compete only with each other for that market share.

157.    As explained, HB 1150 as originally proposed would have stripped permits from pharmacies, including Walmart, that sponsor self-funded health plans for their employees and thus pay prescription drug claims. As amended, however, HB 1150 only covers pharmacies affiliated with PBMs who serve clients in Arkansas beyond the pharmacy's own employee benefit plan. This limitation was necessary because certain lawmakers would not support HB 1150 if it potentially applied to Walmart, which is the State's largest private employer with nearly 60,000 workers in Arkansas as of 2024.

158.    The benefits to Walmart are no coincidence. Lawmakers were acutely aware of what Walmart stands to gain from a law that eliminates its competition in the Arkansas pharmacy market. Some lawmakers invoked Walmart during floor deliberations to whip support for the bill. Representative Lundstrom, for example, argued that "you've even got Walmart and Harps" (another Arkansas-based grocery/pharmacy chain) "concerned" about the situation, and the "little guy's got no chance at all if the big guys are getting beat up."

159.    Ironically, while the Act purports to address "conflicts of interest" between PBMs and their affiliated pharmacies, many of the Act's proponents have ties to in-state pharmacies that spotlight their *own* conflicts. Representative Achor, for example, was vocal about how the Act would benefit his 13 local pharmacies, which would no longer be forced to compete with CVS and other national mail-order pharmacies.

160. The Act is already reshaping the pharmacy market in Arkansas. Since the law's passage, Arkansans have begun transferring their CVS-filled prescriptions to independent pharmacies and locally owned pharmacy chains at unprecedented rates. Since mid-March 2025, Walmart has received nearly two times as many prescriptions transferred from CVS retail pharmacies as from the next closest competitor. The efficacy of this law only underscores both the temptation that every state faces to indulge in economic protectionism and the Founders' wisdom in crafting a constitutional system that "protect[s] free trade among the States." *Nat'l Pork Producers*, 598 U.S. at 408 (Kavanaugh, J., concurring).

### H. The Act Disrupts Pharmacy Networks For Hundreds Of Employer-Sponsored Benefit Plans That Provide Pharmacy Coverage In Arkansas

161. There are roughly 1,000 Caremark-serviced ERISA plan clients who provide coverage in Arkansas. These Caremark-serviced ERISA plans provide key access for approximately 350,000 Arkansans to much-needed pharmaceutical medications. HB 1150 threatens to disrupt this access in contravention of ERISA's clear prohibition on state laws that relate to employee benefit plans.

162. Many Caremark-serviced ERISA plan clients choose from a variety of benefit plan designs to address their members' access to and cost of medications, particularly medications needed to treat chronic conditions such as high blood pressure or high cholesterol. There are plan designs that require or incentivize members with chronic conditions to order 90-day supplies at mail order pharmacies, and plan designs that require members who need costly specialty drugs to obtain them exclusively from specialty pharmacies across the nation.

163. HB 1150 will disrupt these programs in Arkansas. For example, there are plans that design their specialty networks to narrowly include only a handful of specialty pharmacies that primarily mail prescriptions from a few pharmacies throughout the nation. For maintenance

medication programs, many of the pharmaceries where members can receive the discounted mail-order rates would be banned by HB 1150. If HB 1150 is allowed to proceed, then plan members will lose access to the current pharmacy networks, causing significant disruption for plan administrators and members alike.

164.    The law's impact on employee benefit plans will be significant—especially for regional or national employers. Under HB 1150, employee benefit plans will be forced to either create Arkansas-specific carve outs or rearrange their pharmacy networks to meet Arkansas's outlier requirements. In other words, HB 1150 allows Arkansas to dictate how ERISA plans design their pharmacy networks by removing key PBM-affiliated pharmacies as viable plan options. That is exactly what ERISA was enacted to prevent.

165.    Should other States follow the path that Arkansas has blazed by enacting similarly unconstitutional statutes, the disruption on nationwide employee benefit plans would be difficult to overstate.

## I.    The Act's Disruption Of Pharmacy Networks For Medicare Advantage Plans And Medicare Part D Plans

166.    Caremark also provides PBM services for Medicare Advantage-Prescription Drug (MA-PD) and Part D plans that have service areas in Arkansas.

167.    The federal standards governing Medicare Advantage and Medicare Part D plans require a level of access to pharmacy benefits that PBM-designed pharmacy networks help ensure. But HB 1150 will disrupt that access. That is because the law will have the effect of banning PBM-affiliated pharmacies like CVS from operating within the pharmacy network for Medicare Advantage and Part D plans in Arkansas.

168.    This will be a significant loss for these plans because CVS pharmacies are deeply integrated into Medicare Advantage and Medicare Part D prescription drug operations. Under

46

some Medicare Part D plans, CVS pharmacies in Arkansas are "preferred pharmacies." When members fill their prescriptions at preferred pharmacies, those members pay lower prices than those available for the same prescriptions at non-preferred pharmacies. HB 1150 would prevent Arkansans who rely on these CVS pharmacies as their preferred pharmacies from obtaining these cost savings.

169.    Congress has sought to displace state laws that impact Medicare plans in this way. Federal law places comprehensive standards on Medicare plans, and those standards do not countenance any blanket bans on the use of PBM-affiliated pharmacies to fulfill their Medicare obligations.

## CLAIMS FOR RELIEF

## COUNT I

### (Violation of Dormant Commerce Clause)

170.    CVS repeats and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

171.    Under the Articles of Confederation, "each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents." *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U.S. 564, 571 (1997). But this latitude proved self-destructive as the States engaged in a protectionist race to the bottom that "cut[] off the very life-blood of the nation." *Tennessee Wine & Spirits Retailers Ass'n* v. *Thomas*, 588 U.S. 504, 515 (2019) (quotation and citation marks omitted). The Constitution was enacted in no small part to reverse this economic balkanization. *See id.* at 516 ("[W]hen the Constitution was sent to the state conventions, fostering free trade among the States was prominently cited as a reason for ratification.").

172.    More than a century of settled Supreme Court precedent has reinforced the anti-protectionism principles that the Founders embedded in the Commerce Clause. *Tennessee Wine & Spirits*, 588 U.S. at 516-18. That precedent holds that a State may not use "its regulatory power to protect its own citizens from outside competition." *Lewis* v. *BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980). "Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *City of Philadelphia* v. *New Jersey*, 437 U.S. 617, 624 (1978); *see Nat'l Pork Producers Council*, 598 U.S. at 364 ("[N]o State may use its laws to discriminate purposefully against out-of-state economic interests.").

173.    A law is discriminatory under the Dormant Commerce Clause "if it benefits in-state economic interests while also inordinately burdening out-of-state economic interests." *LSP Transmission Holdings, LLC* v. *Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020). The Eighth Circuit "recognizes three indicators of discrimination against interstate commerce": (1) "a statute is adopted with a discriminatory *purpose*;" (2) "a statute has a discriminatory *effect*;" and (3) "a statute discriminates against interstate commerce on its *face*." *Smithfield Foods, Inc.* v. *Miller*, 367 F.3d 1061, 1065 (8th Cir. 2004) (internal citations omitted). Under this standard, even a facially neutral law may be discriminatory if it has a "discriminatory purpose or a discriminatory effect." *LSP Transmission Holdings*, 954 F.3d at 1026. If a law discriminates against interstate commerce, it will be enjoined unless the State can demonstrate, "under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.*

174.    HB 1150 discriminates against interstate commerce in both purpose and effect.

175.    Courts consult legislative history in determining whether an act was adopted with a discriminatory purpose. *See, e.g.*, *Smithfield Foods*, 367 F.3d at 1065-66; *S. Dakota Farm Bureau, Inc.* v. *Hazeltine*, 340 F.3d 583, 594 (8th Cir. 2003). Here, the record groans under the

48

weight of public statements that Arkansas lawmakers made framing HB 1150 as a law that would markedly tilt the playing field in favor of local pharmacies at the expense of large out-of-state chains such as CVS. Legislators repeatedly discussed during committee hearings and floor sessions how this law would benefit these local actors by protecting them from out-of-state competition. The bill's proponents also openly exhibited animus towards CVS and other out-of-state pharmacies because those businesses were perceived as insufficiently loyal to the State and threatened the viability of local, independent pharmacies. Indeed, the stated purpose of the Act is to protect "locally-operated pharmacies" from out-of-state PBM-affiliated pharmacies. HB 1150 § 1(a)(2). The Act's effects reveal the surgical precision with which the State crafted the law to bar only out-of-state businesses from participating in the Arkansas marketplace. The State has not pointed to a *single* Arkansas-based pharmacy that will be affected by the Act's prohibition. By contrast, 23 CVS retail pharmacies will close, and many out-of-state pharmacies that offer mail-order services will be prohibited from delivering medicine to Arkansans. As these entities withdraw from the market, in-state pharmacies will predictably fill the vacuum.

176.   HB 1150 represents a significant windfall for Walmart in particular. As the largest pharmacy chain that will be allowed to operate after HB 1150 goes into effect, Walmart will likely pick up much of the business that will be up for grabs if CVS is forced to exit the State. Since the Act's enactment, Walmart has already begun reaping the law's benefits. Since mid-March 2025, Walmart has received nearly twice as many prescriptions transferred from CVS retail pharmacies as from the next closest competitor. This law thus clears the way for Walmart to expand its pharmacy operations and dominate the Arkansas market.

177.   A law's discriminatory intent can also be inferred if the statute uses a "highly ineffective means to promote the legislative interest asserted by the state." *Smithfield Foods,*

*Inc.*, 367 F.3d at 1065. Here too Arkansas's pretext is apparent. On its face, HB 1150 is dedicated to preventing PBMs from giving affiliated pharmacies preferential treatment relative to nonaffiliated pharmacies. But there is no evidence in the record that such a problem exists. Indeed, CVS Caremark reimburses independent pharmacies in Arkansas at a higher rate than it does CVS pharmacies. Moreover, Arkansas has other laws already on the books that bar PBMs from disfavoring nonaffiliated pharmacies. Thus, there is no reason to think that HB 1150 will achieve its professed goals. *See S. Dakota Farm Bureau*, 340 F.3d at 594 (finding discriminatory purpose because lawmakers had "no evidence that a ban on corporate farming would effectively" achieve the law's professed goals).

178.    To the extent such a problem does exist and Arkansas's goal truly was to address it, the State could have emulated other States in passing additional laws that regulate how PBMs reimburse independent pharmacies. But the State's rejection of these nondiscriminatory and tailored alternatives for HB 1150's heavy-handed ban on PBM-affiliated pharmacies altogether confirms that Arkansas's true goal was to shore up its local pharmaceutical industry at the expense of out-of-state competitors. *See Tennessee Wine & Spirits Retailers Ass'n*, 588 U.S. at 541 (pretext can be established if the state could have accomplished its professed interests in a different manner that was less burdensome on interstate commerce).

179.    In addition, under the Dormant Commerce Clause, even a law that "does not overtly discriminate against interstate commerce, but instead regulates even-handedly, will still be invalidated if 'the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *IESI AR Corp.* v. *Nw. Arkansas Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 604 (8th Cir. 2006) (quoting *U & I Sanitation*, 205 F.3d at 1067 (quoting *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970))). Under the *Pike* test, "the extent of the burden

[on interstate commerce] that will be tolerated will … depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142.

180.    The Act imposes a significant burden on interstate commerce by effectively shutting down existing mail-order pharmacy services in the state.  Upon information and belief, Caremark alone provides approximately 40% of Arkansas's mail-order pharmacy services, and Caremark's mail-order business is run entirely from outside of Arkansas.  *See* Ark. Code Ann. § 17-92-401.    In closing down these operations, the Act substantially disrupts the flow of prescription drugs into Arkansas.

181.    The burden on the flow of prescription drugs into the state from out-of-state sources cannot be justified by the Act's putative local benefits, as those aims could easily be promoted with a lesser impact on interstate activities.  Indeed, Arkansas law already solves for the supposed problem the Act is purportedly designed to rectify—the alleged harms that may follow when PBMs negotiate reimbursement rates with affiliated and unaffiliated pharmacies in the state, where there allegedly may be incentives for PBMs to offer more favorable reimbursement rates to their affiliated pharmacies than to unaffiliated competitors.  Under Ark. Code Ann. § 17–92–507, PBMs are already expressly prohibited from reimbursing unaffiliated pharmacies at less favorable rates than affiliated pharmacies, and violation of that statutory provision is a basis for suspending a PBM's license to operate in the state.

## COUNT II

## (Denial of Equal Protection)

182.    CVS repeats and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

183.    The U.S. Constitution's Equal Protection Clause requires that the government treat all similarly situated people alike. *Barstad* v. *Murray Cnty.*, 420 F.3d 880, 884 (8th Cir. 2005). Even if a plaintiff is not a member of a protected class or group, a law violates the Equal Protection Clause if it "intentionally treat[s] [a plaintiff] differently from others similarly situated" and "there is no rational basis for difference in treatment." *Vill. of Willowbrook* v. *Olech*, 528 U.S. 562, 564 (2000) (per curiam).  HB 1150 violates the Equal Protection Clause by intentionally treating CVS less favorably than other PBM-affiliated pharmacies that are permitted to retain their licenses under HB 1150's exemption.  There is no rational basis for the distinction that the law draws.

184.    As originally drafted, the Arkansas legislature understood that HB 1150 applied to both CVS and Walmart, because both are affiliated with PBMs.  The purported conflict of interest that animates HB 1150 is therefore present under both scenarios.  There is no constitutionally permissible reason why Arkansas nonetheless created an exemption to carve out Walmart while banning CVS's similarly situated pharmacies.

185.    Again, the arbitrariness of this distinction drawn in HB 1150 is amplified by the fact that Arkansas law *already prohibits* the conduct of which legislators complained.  Under Ark. Code Ann. § 17–92–507, PBMs are already expressly prohibited from reimbursing unaffiliated pharmacies at less favorable rates than affiliated pharmacies, and violation of that statutory provision is a basis for suspending a PBM's license to operate in the state.

186.    This prohibition on favoritism is reflected in actual practice, both in Arkansas and nationwide. Caremark consistently reimburses its affiliated pharmacies *less* than independent pharmacies as a percentage of NADAC pricing. Indeed, in Arkansas, Caremark reimburses independent pharmacies at a higher rate than CVS pharmacies. The law, in other words, purports to solve a problem that does not exist.

187.    Nor is there any rational economic justification for the law that would justify such a distinction. In recent years, the number of independent pharmacies in metropolitan areas has experienced a 26.5% growth. NCPDP's data reflects that between 2007 and 2021, there was a 13.5% increase in the number of independent pharmacies nationwide.

188.    Data maintained by NCPA, an independent pharmacy lobbying group, also demonstrates independent pharmacies' gross margins and market share have remained relatively stable between 2007 and 2021. NCPA data shows that, as of 2022, independent pharmacies accounted for 34% of all retail pharmacies—far larger than any individual PBM-affiliated pharmacy.

## COUNT III

### (ERISA Preemption)

189.    CVS repeats and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

190.    ERISA includes a sweeping clause that preempts "any and all state laws insofar as they may now or hereafter relate to any employee benefit plans." 29 U.S.C. § 1144(a).

191.    Under this broad express preemption provision, ERISA preempts state laws that have any "connection with or reference" to ERISA plans. *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96–97 (1983). State laws are impermissibly connected with employee benefit plans if they

implicate an "area of core ERISA concern"—for example, if they "require providers to structure benefit plans in particular ways," govern a central matter of plan administration, or interfere with nationally uniform plan administration. *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 87 (2020); *see Gobeille* v. *Liberty Mut. Ins. Co.*, 577 U.S. 312, 320-21 (2016); *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001).

192.    By prohibiting PBM-affiliated pharmacies from operating in Arkansas (with an exemption for Walmart and perhaps a few others), HB 1150 has the effect of reducing the type of licensed pharmacies that are available in the State. As a result, the law imposes significant restrictions on pharmacy networks and the type of coverage that plan sponsors can incorporate into their benefit plan design.

193.    The scope and adequacy of a pharmacy network is a critical component of an ERISA-covered health plan's benefit design. Many ERISA-covered plans opt to offer pharmacy networks that include pharmacies (whether retail, mail-order, specialty, or all of the above) that are affiliated with their chosen PBM. This structure is attractive for plan sponsors because it can yield cost savings for both the plan sponsor and plan participants and beneficiaries. But HB 1150 takes this approach off the table for virtually any plan that intends to offer coverage in Arkansas, effectively eliminating the plan sponsors' discretion to shape benefits for their employees as they see fit.

194.    In response, employers that provide coverage across the nation will need to either incur the administrability costs of carving out Arkansas or alter their plans and the terms or scope of the plans' existing service provider arrangements to fit the State's specifications. Either result is an impermissible intrusion on an area exclusively governed by federal law. And if other States pass similar laws, it would become nearly impossible for plans to maintain the nationally

uniform plan administration that is necessary for multi-state employers. To accommodate competing jurisdictional obligations, sponsors of nationwide plans will need to redesign employee benefits, including their pharmacy networks, on a State-by-State basis. That is an untenable result that runs directly contrary to ERISA's emphasis on supporting plan administrators who must design benefits for employees across multiple jurisdictions.

195.    Because HB 1150 intrudes on substantive plan design decisions and interferes with nationally uniform plan administration, it is expressly preempted by ERISA. *See* 29 U.S.C. § 1144(a).

## COUNT IV

### (Medicare Preemption)

196.    CVS repeats and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

197.    The Medicare program provides health benefits to individuals over 65 years of age and other selected groups. The Medicare program originally consisted of two parts: Part A (for inpatient care) and Part B (for physician services, outpatient care, and other specified healthcare services). In 1997, Congress created Part C of the Medicare program, under which beneficiaries may obtain all coverage available through Parts A and B through a managed care organization. Part C is now known as the Medicare Advantage program.

198.    In 2003, Congress established the Medicare prescription drug benefit as part of the MMA. The program, referred to as Medicare Part D, went into effect on January 1, 2006.

199.    Medicare Part D subsidizes the costs of prescription drugs for Medicare beneficiaries, including U.S. citizens and lawful permanent residents age 65 and older and certain younger people with disabilities. Medicare Part D consists of a comprehensive statutory

and regulatory scheme that aims to balance costs (both to the government and to beneficiaries) with access to prescription drugs. Upon implementation of this new feature of the Medicare benefit structure in 2006, Medicare participants had the choice of obtaining prescription drug benefits by enrolling in a privately sponsored Part D prescription drug plan, or by electing to participate in a privately sponsored Medicare Advantage plan offering Part D prescription drug benefits—referred to as a "Medicare Advantage Prescription Drug" or "MA-PD" plan.

200.    Medicare's prescription drug benefit scheme employs "a market-based model under which marketplace competition ensures that enrollees receive low prices for prescription drugs." Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4244 (2005). All Medicare Part D beneficiaries must receive their benefits through a nongovernmental entity, a Medicare Part D plan sponsor (or, as applicable, an MA-PD sponsor) as there is no mechanism to allow pharmacists to bill Medicare directly for Medicare Part D-covered drugs. 42 U.S.C. §1395w-101(a)(1)(A). Part D and MA-PD plan sponsors, through PBMs, negotiate with pharmacies for competitive pricing and service arrangement. *See* 42 U.S.C. §1395w-102(d) (requiring Part D plan sponsors to provide Part D beneficiaries "with access to negotiated prices"). In turn, Part D and MA-PD plan sponsors compete for beneficiaries by offering different coverage options, with different ranges of potential out-of-pocket expenses.

201.    In order to ensure that Medicare Advantage (including MA-PD) and Medicare Part D plans and benefits are subject to uniform federal rules, Congress adopted a broad express preemption provision for state laws with respect to such plans. That preemption provision states: "The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage

56

and Part D plans] which are offered by [Medicare Advantage and Medicare Part D plan sponsors] under this part." 42 U.S.C. §1395w-26(b)(3); *see also* 42 U.S.C. § 1395w-112(g) ("The provisions of sections 1395w-24(g) and 1395w-26(b)(3) of this title shall apply with respect to [Part D plan] sponsors and prescription drug plans under this part in the same manner as such sections apply to [Medicare Advantage] organizations and [Medicare Advantage] plans under part C of this subchapter."). This provision does not require a conflict between federal and state standards for preemption to apply. Instead, in enacting this provision, Congress "expand[ed] the scope of express Medicare preemption from conflict preemption to field preemption." *PCMA* v. *Webhi*, 18 F.4th 956, 971 (8th Cir. 2021).

202.    Congress intended federal regulation of such plans to be exclusive, broadly foreclosing state laws that could interfere with uniform, nationwide administration. *See* H.R. Rep. No. 108-391, at 557 ("[T]he [Medicare Advantage] program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency.").

203.    Federal law also sets forth a comprehensive, reticulated set of standards to govern the operation of MA-PD and Part D plans with respect to their administration of prescription drug benefits. These standards, many of which are set forth in 42 C.F.R. Part 423, cover virtually every aspect of the operations of MA-PD and Part D plans with respect to their furnishing of prescription drug benefits to beneficiaries, including their construction of drug formularies, negotiation of drug prices with pharmaceutical manufacturers, beneficiary cost-sharing structures, establishment and maintenance of pharmacy networks (including establishment of "preferred" network pharmacies and the terms and conditions of pharmacy contracts generally), beneficiary access to out-of-network pharmacies, medication and utilization

management programs, claim processing, and recordkeeping. Such standards effectively compel MA-PD and Part D plan sponsors to function as, or to employ, PBMs as an essential part of their operations, and they do not preclude such sponsors from discharging these functions by integrating their operations—including by owning and operating pharmacies.

204.    To the contrary, CMS standards permit what HB 1150 prohibits. For instance, one regulatory standard expressly adverts to MA-PD and Part D plans' provision of mail-order prescription options for beneficiaries. *See* 42 C.F.R. 423.120(a)(3). Another standard allows Part D plans, upon waiver, to rely on wholly-owned pharmacies as the primary means of furnishing prescription drugs to beneficiaries, and exempts such plans from pharmacy access requirements.   42 C.F.R. 423.120(a)(7); *see* Medicare Prescription Drug Benefit Manual, Chapter 5: Benefits and Beneficiary Protections, § 50.7.1 ("MA-PD plans or cost plans that provide access ... to qualified prescription drug coverage through retail pharmacies owned and operated by the MA organization that offers the plan or the cost plan will not be required to meet the retail pharmacy access standards in section 50.1. However ... the MA-PD plan or cost plan in question must have a pharmacy network that ... provides comparable pharmacy access to its enrollees as provided under [the relevant regulations].").

205.    To improve beneficiary access to pharmacies, Medicare standards generally require MA-PD and Part D plans to admit "any willing pharmacy" to their standard networks on standard terms, including the terms and conditions in network pharmacy contracts and allowing retail pharmacies to provide the same fill quantities as any mail-order pharmacies engaged or operated by the plan sponsor. *See generally* 42 C.F.R. 423.120.

206.    HB 1150 is a state law "with respect to" MA-PD and Part D plans because it effectively regulates such PBM-affiliated plans by prohibiting the use of their PBM-affiliated

pharmacies to fulfill plan obligations. Under the comprehensive regulatory framework for MA-PD and Part D plans, a state law may not interfere in this way with a plan's ability to fulfill its prescription drug benefit obligations, because that field is exclusively within the province of federal regulation. *See* 42 U.S.C. § 1395w-26(b)(4). The Medicare Act is intended to provide such plans with ample discretion to make design choices that are appropriate for its beneficiaries, yet HB 1150 looks to restrict this flexibility by removing PBM-affiliated pharmacies from Arkansas. *See* Medicare Program, 70 Fed. Red. at 4614 ("We interpret the statute to allow for flexibility in plan design, within the constraints of statutory language, to promote competition.").

207. The law also acts "with respect to" MA-PD and Part D plans because it intrudes on the federal pharmacy access standards for such plans. For instance, one regulatory standard expressly refers to MA-PD and Part D plans' provision of mail-order prescription options for beneficiaries. *See* 42 C.F.R. 423.120(a)(3). In addition, the MMA's implementing regulations waive pharmacy access standards for MA-PD and Part D "cost" plans that own and operate retail pharmacies in certain circumstances, 42 C.F.R. 423.120(a)(7), such as when the plan "provides Part D drugs predominantly through plan-owned and operated retail pharmacies (i.e., more than 50 percent of prescriptions are provided through owned and operated retail pharmacies)," Medicare Prescription Drug Benefit Manual, Chapter 5: Benefits and Beneficiary Protections, § 50.7.1. The Medicare standards also contain pharmacy network contracting requirements, including an obligation that Part D sponsors allow any willing pharmacy to participate in the plan's standard network. *See* 42 C.F.R. 423.120(a)(8)(i) ("In establishing its contracted pharmacy network, a Part D sponsor offering qualified prescription drug coverage . . . [m]ust contract with any pharmacy that meets the Part D sponsor's standard terms and conditions."). Because these standards touch on pharmacy ownership by Medicare plan sponsors in some

circumstances, the MMA preempts state regulation on that subject matter. *See* 42 U.S.C. § 1395w-26(b)(4).

208.    Although the Medicare preemption clause exempts "State licensing laws" from its scope, Congress did not intend that exemption to authorize States to evade the statute's preemptive force simply by labeling every regulation a licensing requirement. Recognizing as much, the Department of Health & Human Services (HHS) has interpreted this exception narrowly to encompass only the traditional objects of licensing under state law. Specifically, HHS has explained that "the exception for State laws that relate to 'State licensing' must be limited to State requirements for becoming State licensed, and would not extend to any requirement that the State might impose on licensed health plans that absent Federal preemption must be met as a condition for keeping a State license." Medicare Program: Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588-01, 4663-64 (Jan. 28, 2005). HB 1150 is not addressed to anything resembling traditional licensing standards. Instead, the law seeks to regulate the structure of MA-PD and Part D plans and their offerings in the Medicare marketplace by leveraging the State's licensing power.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray this Court:

(1) declare that the Act violates the Commerce Clause of the United States Constitution because it discriminates against and/or excessively burdens interstate commerce;

(2) declare that the Act violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it intentionally disadvantages Plaintiffs compared to similarly situated actors and has no rational basis for doing so;

(3) declare that the Act is preempted by the Employee Retirement Income Security Act of

1974, 29 U.S.C. § 1144(a);

(4) declare that the Act is preempted by the Medicare Modernization Act, 42 U.S.C. § 1395w-26(b)(3);

(5) grant preliminary and permanent injunctive relief enjoining Defendants and their agents from taking any action to implement or enforce the Act; and

(6) grant Plaintiffs such additional or different relief as the Court deems just and proper.


Dated:  May 29, 2025

Respectfully submitted,

/s/

J. Carter Fairley, AR BIN 99068
Ben C. Hall, AR BIN 2010159
BARBER LAW FIRM PLLC
1 Allied Drive
Suite 1600
Little Rock, AR  72202
501-372-6175 / 888-412-3288 – facsimile
cfairley@barberlawfirm.com
bhall@barberlawfirm.com


O'MELVENY & MYERS LLP

Meaghan VerGow*
Brian D. Boyle*
Deanna M. Rice*
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

*Attorneys for Plaintiffs*

*pro hac vice* applications forthcoming

SULLIVAN & CROMWELL LLP

Jeffrey B. Wall*
Judson O. Littleton*

SULLIVAN & CROMWWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

*Attorneys for Plaintiffs*

*pro hac vice* applications forthcoming

## SECTION 16-111-111(a) CERTIFICATION

Pursuant to Section 16-111-111(a) of the Arkansas Code, I certify that the Attorney General has been served with a copy of the Complaint for Declaratory and Injunctive Relief contemporaneous with its filing.

/s/ _____

J. Carter Fairley, AR BIN 99068
Ben C. Hall, AR BIN 2010159
BARBER LAW FIRM PLLC
1 Allied Drive
Suite 1600
Little Rock, AR 72202
501-372-6175 / 888-412-3288 – facsimile
cfairley@barberlawfirm.com
bhall@barberlawfirm.com

*Attorney for Plaintiffs*