**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | |
|---|---|
| CVS PHARMACY, INC., CAREMARK RX, LLC, ARKANSAS CVS PHARMACY, LLC, CP ACQUISITION, LLC, ADVANCED CARE SCRIPTS, INC., AMC-TENNESSEE, LLC, CAREMARK ARIZONA MAIL PHARMACY, LLC, CAREMARK ARIZONA SPECIALTY PHARMACY, LLC, CAREMARK FLORIDA MAIL PHARMACY, LLC, CAREMARK FLORIDA SPECIALTY PHARMACY, LLC, CAREMARK ILLINOIS SPECIALTY PHARMACY, LLC, CAREMARK KANSAS SPECIALTY PHARMACY, LLC, CAREMARK MASSACHUSETTS SPECIALTY PHARMACY, LLC, CAREMARK MICHIGAN SPECIALTY PHARMACY, LLC, CAREMARK NEW JERSEY SPECIALTY PHARMACY, LLC, CAREMARK NORTH CAROLINA SPECIALTY PHARMACY, LLC, CAREMARK TENNESSEE SPECIALTY PHARMACY, LLC, CAREMARK TEXAS MAIL PHARMACY, LLC, CAREMARK, LLC, CAREMARKPCS PENNSYLVANIA MAIL PHARMACY, LLC, CENTRAL RX SERVICES, LLC, CORAM ALTERNATE SITE SERVICES, INC., CVS RX SERVICES, INC., EXPRESS PHARMACY SERVICES OF PA, LLC, HOLIDAY CVS, LLC, I.G.G. OF AMERICA, LLC, JHC ACQUISITION LLC, NCS HEALTHCARE OF KENTUCKY, LLC, PHARMACY CONSULTANTS, LLC, PROCARE PHARMACY DIRECT, LLC, PROCARE PHARMACY, LLC, SILVERSCRIPT INSURANCE COMPANY, COVENTRY HEALTH AND LIFE INSURANCE COMPANY, COVENTRY HEALTH | Civil Action No. 4:25-cv-00524 |

CARE OF KANSAS, INC., and
COVENTRY HEALTH CARE OF
MISSOURI, INC.,

        Plaintiffs,

   v.

ARKANSAS STATE BOARD OF
PHARMACY; RODNEY RICHMOND,
BRIAN JOLLY, DEBBIE MACK,
LENORA NEWSOME, CLINT BOONE,
LYN FRUCHEY, HAROLD H. SIMPSON,
and BETH ANN DAVENPORT, in their
official capacities as members of the
Arkansas State Board of Pharmacy; and
JOHN KIRTLEY, in his official capacity as
Executive Director of the Arkansas State
Board of Pharmacy,

        Defendants.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT...............................................................................................1

BACKGROUND......................................................................................................................8

    A.    The Delivery Of Prescription Drugs To Patients And The Role Of PBMs ............8

    B.    CVS's Operations in Arkansas .................................................................................9

    C.    Preexisting Regulation Of PBMs Under Arkansas Law ........................................10

    D.    The Legislative Background of HB 1150 ...............................................................11

    E.    House Bill 1150 As Enacted ..................................................................................17

    F.    House Bill 1150's Impact .......................................................................................18

ARGUMENT..........................................................................................................................21

I.      PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS........................21

    A.    HB 1150 Violates the Dormant Commerce Clause................................................22

        1.    HB 1150 discriminates against out-of-state pharmacies..........................24

        2.    HB 1150 flunks the *Pike* balancing test. .................................................31

    B.    HB 1150 Violates the Equal Protection Clause. ....................................................33

    C.    HB 1150 Is Preempted By Federal Law. ................................................................35

        1.    HB 1150 is preempted by ERISA...............................................................36

        2.    HB 1150 is preempted by Medicare Part D. ..............................................39

II.     PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT
        PRELIMINARY INJUNCTIVE RELIEF............................................................43

III.    THE PUBLIC INTEREST SUPPORTS PRELIMINARY RELIEF...................46

CONCLUSION .....................................................................................................................48

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aetna Health Inc.* v. *Davila,*
542 U.S. 200 (2004).................................................................................................36

*Alden* v. *Maine,*
527 U.S. 706 (1999)................................................................................................ 7

*Arcadian Health Plan, Inc.* v. *Korfman,*
2010 WL 5173624 (D. Me., Dec. 14, 2010) ..........................................................43

*Arizona* v. *United States,*
567 U.S. 387 (2012)................................................................................................35

*Bacchus Imports, Ltd.* v. *Dias,*
468 U.S. 263 (1984)............................................................................................... 28

*Brandt ex rel. Brandt* v. *Rutledge,*
47 F.4th 661 (8th Cir. 2022) ..................................................................................46

*Cachia* v. *Islamorada,*
542 F.3d 839 (11th Cir. 2008)................................................................................27

*Camps Newfound/Owatanna, Inc.* v. *Town of Harrison,*
520 U.S. 564 (1997)............................................................................................... 23

*Chamber of Com. of U.S.* v. *Edmondson,*
594 F.3d 742 (10th Cir. 2010).................................................................................44

*Chamber of Com. of United States of America* v. *Whiting,*
563 U.S. 582 (2011).................................................................................................35

*Chemical Waste Mgmt., Inc.* v. *Hunt,*
504 U.S. 334 (1992)................................................................................................28

*Cigna Corp.* v. *Bricker,*
103 F.4th 1336 (8th Cir. 2024)................................................................................43

*City of Cleburne* v. *Cleburne Living Ctr., Inc.,*
473 U.S. 432 (1985)................................................................................................34

*City of Philadelphia* v. *New Jersey,*
437 U.S. 617 (1978)................................................................................................ 24

*Cloverland-Green Spring Dairies, Inc.* v. *Penn. Milk Mktg. Bd.*,
   298 F.3d 201 (3d Cir. 2002) ...................................................................... 26

*Commonwealth* v. *Biden*,
   57 F.4th 545 (6th Cir. 2023) ...................................................................... 7

*Comptroller of Treasury of Md.* v. *Wynne*,
   575 U.S. 542 (2015)..................................................................................... 22

*Dean Milk Co.* v. *City of Madison*,
   340 U.S. 349 (1951)..................................................................................... 24

*Dennis* v. *Higgins*,
   498 U.S. 439 (1991).....................................................................................45

*Eggers* v. *Evnen*,
   48 F.4th 561 (8th Cir. 2022) ..................................................................... 21

*Exxon Corp.* v. *Governor of Maryland*,
   437 U.S. 117 (1978)..................................................................................... 25

*Family Winemakers of California* v. *Jenkins*,
   592 F.3d 1 (1st Cir. 2010) ..........................................................................27

*FMC Corp.* v. *Holliday*,
   498 U.S. 52 (1990).......................................................................................36

*Fort Halifax Packing Co., Inc.* v. *Coyne*,
   482 U.S. 1 (1987).........................................................................................39

*Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992).......................................................................................35

*Gobeille* v. *Liberty Mut. Ins. Co.*,
   577 U.S. 312 (2016).....................................................................................39

*Granholm* v. *Heald*,
   544 U.S. 460 (2005)............................................................................... 23, 32

*Healy* v. *Beer Inst., Inc.*,
   491 U.S. 324 (1989).....................................................................................32

*Hunt* v. *Washington State Apple Advertising*, 432 U.S. 333 (1977) .................................. 26

*IESI AR Corp.* v. *Northwest Arkansas Regional Solid Waste*,
   433 F.3d 600 (8th Cir. 2006) ................................................................24, 25, 31

iii

*Int'l Franchise Ass'n, Inc.* v. *City of Seattle,*
803 F.3d 389 (9th Cir. 2015) ...........................................................................6

*Iowa Utilities Bd.* v. *FCC,*
109 F.3d 418 (8th Cir. 1996) .........................................................................6, 7

*Jet Midwest Int'l Co., Ltd.* v. *Jet Midwest Grp., LLC,*
953 F.3d 1041 (8th Cir. 2020) ...................................................................... 22

*Kassel* v. *Consolidated Freightways Corp.,*
450 U.S. 662 (1981) ........................................................................................31

*Lewis* v. *BT Inv. Managers, Inc.,*
447 U.S. 27 (1980) ......................................................................................... 24

*Mathers* v. *Wright,*
636 F.3d 396 (8th Cir. 2011) .........................................................................33

*Metro. Life Ins. Co. v. Massachusetts,*
471 U.S. 724 (1985) .......................................................................................37

*Missouri* v. *Trump,*
128 F.4th 979 (8th Cir. 2025) ..................................................................44, 46

*Morehouse Enters., LLC* v. *Bureau of Alcohol, Tobacco, Firearms, &*
*Explosives,*
78 F.4th 1011 (8th Cir. 2023) ........................................................................45

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
514 U.S. 645 (1995) ..................................................................................36, 38

*Nat'l Pork Producers Council* v. *Ross,*
598 U.S. 356 (2023) ............................................................... 2, 22, 24, 31

*Ng* v. *Bd. of Regents of Univ. of Minn.,*
64 F.4th 992 (8th Cir. 2023) ....................................................................21, 45

*Nken* v. *Holder,*
556 U.S. 418 (2009) ...................................................................................... 46

*Or. Waste Sys., Inc.* v. *Dep't of Env't Quality of Or.,*
511 U.S. 93 (1994) ......................................................................................... 24

*Pharm. Care Mgmt. Ass'n* v. *Mulready,*
78 F.4th 1183 (10th Cir. 2023) ...............................................................38, 41

iv

*Pharm. Care Mgmt. Ass'n v. Rutledge*,
891 F.3d 1109 (8th Cir. 2018), *rev'd on other grounds*, 592 U.S. 80 ..........................40, 41

*Pharm. Care Mgmt. Ass'n* v. *Wehbi*,
18 F.4th 956 (8th Cir. 2021) ..............................................................................40, 41

*Pike* v. *Bruce Church*,
397 U.S. 137 (1970)..................................................................................... 31, 33

*Richland/Wilkin Joint Powers Auth.* v. *United States Army Corps of Eng'rs*,
826 F.3d 1030 (8th Cir. 2016) ...............................................................................43

*Rutledge* v. *Pharm. Care Mgmt. Ass'n*,
592 U.S. 80 (2020).................................................................................36, 37, 38

*SFFA* v. *President and Fellows of Harvard College*,
600 U.S. 181 (2023).............................................................................................3

*Shaw* v. *Delta Air Lines, Inc.*,
463 U.S. 85 (1983)............................................................................................38

*Smithfield Foods, Inc.* v. *Miller*,
367 F.3d 1061 (8th Cir. 2004) ..............................................................................24

*South Dakota Farm Bureau, Inc.* v. *Hazeltine*,
340 F.3d 583 (8th Cir. 2003) .................................................................................3

*Tenn. Wine & Spirits Retailers Ass'n* v. *Thomas*,
588 U.S. 504 (2019)..................................................................................... 22, 23

*Texas* v. *EPA*,
829 F.3d 405 (5th Cir. 2016) ................................................................................ 7

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......................................................................................6, 44

*U & I Sanitation* v. *City of Columbus*,
205 F.3d 1063 (8th Cir. 2000)...............................................................................31

*University of Texas* v. *Camenisch*,
451 U.S. 390 (1981)............................................................................................ 22

*Vill. of Willowbrook* v. *Olech*,
528 U.S. 562 (2000) ...........................................................................................34

*S.J.W. ex rel. Wilson* v. *Lee's Summit R-7 Sch. Dist.*,
696 F.3d 771 (8th Cir. 2012)...............................................................................21

*Winter* v. *NRDC*,
    555 U.S. 7 (2008)........................................................................................21

**Federal Statutes**

29 U.S.C. § 1001(b) ........................................................................................36

29 U.S.C. § 1144(a)....................................................................................5, 37

42 U.S.C. § 1395w-22(d) ...............................................................................41

42 U.S.C. § 1395w-26(b) ....................................................................5, 36, 40

42 U.S.C. § 1395w-112(g) .............................................................................40

**State Statutes**

Ark. Code Ann. § 17-92-105 ...........................................................................5

Ark. Code Ann. § 17-92-106 ...........................................................................5

Ark. Code Ann. § 17-92-416 ....................................................................17, 18

Ark. Code Ann. § 17-92-417 ....................................................6, 17, 18, 45

Ark. Code Ann. § 17-92-507 ....................................................................10, 30

Ark. Code Ann. § 23-99-203(d) ..............................................................8, 11, 30

Ark. Code Ann. § 23-99-204(a)(3) ...........................................................8, 11, 30

Ark. Code Ann. § 23-92-503 ...........................................................................13

Ark. Code Ann. § 23-92-506 ....................................................................10, 11, 30

Act 624.......................................................................................................4, 17

H.B. 1150, 95th Gen. Assemb., Reg. Sess. § 2(b) (Ark. 2025) (as proposed on Jan. 16, 2025) ....................................................................................................13

H.B. 1150, 95th Gen. Assemb., Reg. Sess. § 2(b) (Ark. 2025) (Mar. 12, 2025 draft)............13

H.B. 1150, 95th Gen. Assemb., Reg. Sess. § 2(b) (Ark. 2025) (Mar. 18, 2025 draft)............14

**Regulations**

42 C.F.R. 423.120 ....................................................................................40, 42

Medicare Program;  Establishment of the Medicare Advantage Program, 70
Fed. Reg. 4588 (Jan. 28, 2005)..................................................................41, 42, 43

**Constitutional Provisions**

U.S. Const. Article I, § 8, cl. 3 .................................................................................. 22

**Other Authorities**

*Arkansas House of Representatives Floor Session*, Apr. 3, 2025,
https://tinyurl.com/mr2ahke8..............................................................................15

Arkansas Pharmacists Ass'n (@arkpharm), Instagram (Apr. 18, 2025),
https://tinyurl.com/35aydntc...............................................................................19

*Arkansas Senate Floor Session*, Apr. 9, 2025, https://tinyurl.com/y7fj53m5 .................15, 29

Benjamin Hardy, *Sanders Signs Bill to Strip CVS and Other PBMs of
Pharmacy Licenses in Arkansas*, Ark. Times (Apr. 16, 2025),
https://tinyurl.com/sw9c9p72..............................................................................18

Chip Scarborough, *Arkansas Lawmakers Advance Bill That Could Potentially
Eliminate CVS in the Natural State*, 4029 News (Apr. 8, 2025),
https://tinyurl.com/bdfvf8pu..................................................................................6

Dan Sullivan, *HB1150 Puts Pharmacy Patients, Quality Care First*, Jonesboro
Sun (Mar. 17, 2025), https://tinyurl.com/y8njmynd .....................................14, 28

Dennis W. Carlton et al., *PBMs and Prescription Drug Distribution: An
Economic Consideration of Criticisms Levied Against Pharmacy Benefit
Managers* (Apr. 2025), https://tinyurl.com/5e9cuyxx ........................................ 30

*Employee Benefits:  Pharmacy FAQs: "What is a Pharmacy Benefits
Manager,"* Arkansas Dep't of Transformation & Shared Servs.,
https://transform.ar.gov/employee-benefits/faq/pharmacy ...............................9

Greg Geary, *Small Pharmacies in Danger of Closing if PBM Bill Doesn't Pass,
State Representative Says*, White Cnty. Citizen (Mar. 27, 2025),
https://tinyurl.com/bdennnse................................................................................13, 14

*Hearing Before the Arkansas House Insurance and Commerce Committee*,
Apr. 2, 2025 , https://tinyurl.com/2c23k6bv.......................................14, 15, 16, 29

*Hearing Before the Arkansas Senate Insurance and Commerce Committee*,
Apr. 8, 2025, https://tinyurl.com/fkphttee..................................................16, 17

vii

Maggie Ryan, *Lawmakers Introduce Bill to Ban PBM-Owned Pharmacies*, Little Rock Pub. Radio (Jan. 17, 2025), https://tinyurl.com/5b7y2b3x ......................12, 29

Mark Friedman, *Arkansas Bill Would Bar PBMs from Selling Drugs*, Ark. Bus. (Feb. 24, 2025), https://tinyurl.com/atttr4zz.........................................11, 12, 29

Neal Earley, *Sanders Signs Bill Opposed by CVS; Measure Prohibits Prescription Drug Middlemen from Owning Pharmacies*, Ark. Democrat-Gazette (Apr. 16, 2025), https://tinyurl.com/b7vsf6nt........................................................15

Pharmacists United for Truth & Transparency, *Arkansas HB 1150: Combatting PBM Anticompetitive Practices with State Legislation*, YouTube.com, at 34:29-35:07 (Feb. 2, 2025), https://tinyurl.com/37pbd3c4 ............................................12, 13

Press Release, PCMA, Updated Comprehensive Analysis from Leading Economists Confirms PBMs Deliver Value for Plan Sponsors, Support Pharmacies (Apr. 30, 2025), https://tinyurl.com/3fnw88zf ................................................ 30

Press Release, Pharmacists United for Truth & Transparency, Arkansas' New Bill to Ban PBM-Owned Pharmacies From Operating in State Is "a Win" for Patients and Local Pharmacists (Jan. 16, 2025), https://tinyurl.com/33pzff9u...............11

RXReformNow (@RXReformNow), Twitter (Feb. 6, 2025, 1:02 PM), https://tinyurl.com/yc3t47pe........................................................................19

Sarah Huckabee Sanders, Opinion, *My State Is Taking on the Middlemen Who Inflate Drug Prices*, N.Y. Times (June 10, 2025)......................................... 21, 47

Steve Brawner, *Bill Would Prevent PBMs from Dispensing Drugs Via Retail, Mail*, Talk Bus. & Pol. (Jan. 16, 2025), https://tinyurl.com/mut5auur.............................11

Steve Watts & Wendy Jones, *State Legislators From White County Discuss Challenges PBMs Bill Faces Despite Finally Making It Out Of Committee*, White Cnty. Citizen (Apr. 3, 2025), https://tinyurl.com/4ewb8y75...............................................................................35

*Walmart Expands Pharmacy Central Fill Operations with Opening of Largest Facility Yet in Frederick, Maryland*, Walmart (May 22, 2025), https://tinyurl.com/yzjv5jxy................................................................................26

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs move to preliminarily enjoin enforcement of the Arkansas law challenged in this case under 42 U.S.C. § 1983 and the Federal Constitution.

## PRELIMINARY STATEMENT

The Arkansas law challenged in this case is a textbook example of the kind of economic protectionism that the Framers sought to abolish when scrapping the Articles of Confederation for the Constitution. By its terms, Arkansas House Bill No. 1150 (HB 1150) adopts an unprecedented prohibition on pharmacies that are affiliated with pharmacy benefit managers (commonly referred to as PBMs) continuing to operate in the State. But as both the effects and acknowledged purpose of HB 1150 make clear, the law's true goal is to do something else: shore up local Arkansas-owned pharmacies by expelling major out-of-state pharmacies like CVS from Arkansas. In fact, thanks to a late-breaking amendment to HB 1150 arising from lawmakers' concern that the law might prohibit Walmart from operating pharmacies in the State, the law as enacted distinguishes between in-state and out-of-state pharmacies with surgical precision. It forces CVS and many other significant out-of-state pharmacies to leave the State, while leaving *every single in-state pharmacy* untouched.

That was no accident. Given that outright economic discrimination is blatantly unconstitutional, the law uses PBM affiliation as a proxy for targeting out-of-state pharmacies and claims that it is motivated by a concern that PBM-affiliated pharmacies increase drug prices. But the legislative record tells the real story of HB 1150's protectionist impulse. Numerous lawmakers and special-interest groups openly supported the law on the ground that it would help in-state pharmacies expand their market share.

1

On the other hand, the stated motive of limiting PBMs' pricing power collapses under minimal scrutiny. PBMs such as Caremark—CVS's PBM affiliate—already pay non-affiliated pharmacies *more* than CVS retail pharmacies, in part because Arkansas law already requires them to do so. And that is just one of the less burdensome regulations that Arkansas already imposes (or could choose to impose) on PBMs to address any perceived problem with drug prices.

Despite the pretense, HB 1150 is unconstitutional in several respects. First, the law violates the Dormant Commerce Clause twice over. In both design and effect, the law impermissibly discriminates against out-of-state enterprises in violation of the "antidiscrimination principle" that "lies at the very core" of the Commerce Clause. *Nat'l Pork Producers Council* v. *Ross*, 598 U.S. 356, 369 (2023) (citation and quotation marks omitted). The record brims with evidence that the State was motivated to protect in-state pharmacies—both independent pharmacies as well as large pharmacy chains like Walmart—at the expense of out-of-state competitors like CVS. Lawmakers and Arkansas pharmacy owners crowed that HB 1150 would shutter CVS's pharmacies while helping locally owned pharmacies expand their market share. For instance, Senator Dan Sullivan described the bill as "protect[ing] competition so local pharmacies can keep serving their communities." And Senator Kim Hammer lauded "local independent pharmacies" that are "investing in their communities" and are "there for the long haul," drawing an explicit contrast with out-of-state CVS, which he portrayed as "sucking the economy out" of Arkansas and willing to "pull out" from the State at any moment.

The law's opponents understood the statute the same way. Senator Irvin, for instance, criticized the law as a blunt effort by Arkansas to leverage its licensing power to pick "winners and losers." Randy Zook, President of the Arkansas Chamber of Commerce, argued that HB 1150 was designed to "remove competition from the market." Tellingly, Arkansas did not provide any state-specific evidence to justify this drastic intervention. *See South Dakota Farm Bureau, Inc.* v. *Hazeltine*, 340 F.3d 583, 593-596 (8th Cir. 2003) (law was likely discriminatory because the State provided "no evidence" that it would further its putative goals). The Dormant Commerce Clause does not countenance such protectionist legislation, and Arkansas cannot use a proxy to mask its impermissible motive because "[w]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows." *SFFA* v. *President and Fellows of Harvard College*, 600 U.S. 181, 230 (2023).

Regardless of whether it is discriminatory, HB 1150 also runs afoul of the Dormant Commerce Clause because the vast burdens that it imposes (exclusively) on interstate commerce clearly outweigh any putative benefits that the law will produce—particularly in light of existing Arkansas laws that already regulate the reimbursement rates that PBMs could charge non-affiliated pharmacies. CVS's PBM, Caremark, reimburses non-affiliated pharmacies in Arkansas at a *higher* rate than CVS's retail pharmacies. Nationwide evidence points the same way: one study found that PBMs tend to pay non-affiliated pharmacies 5.9% more than affiliates. On the other side of the ledger, the law undeniably imposes immense burdens. CVS stands to lose at least $110 million if HB 1150 goes into effect. In 2024, PBM-affiliated pharmacies that are based out of state altogether filled

3

millions of prescriptions for hundreds of thousands of Arkansans, and these companies will likely take a similarly significant economic hit if the Arkansas market locks them out. Arkansan patients will also suffer if the law goes into effect. As PBM-affiliated pharmacies based from somewhere other than Arkansas are forced to leave the market, in-state competitors are likely to take advantage of the reduced competition and their expanded market share by increasing prices—thus undermining the consumer-centric interests that putatively animated the law's enactment.

Second, HB 1150 also violates the Equal Protection Clause. The law bans CVS and other PBM-affiliated pharmacies from operating in Arkansas, but provides an exemption for the only Arkansas-based pharmacy chain lawmakers believed was affiliated with a PBM (Walmart). But there is no constitutionally permissible reason for this distinction—*i.e.*, no reason other than Arkansas's bare desire to tilt the scales in favor of its local businesses. After all, the law purportedly aims to eradicate situations where PBMs "act as both a price setter and a price taker," Act 624 § 1(a)(3), but that dynamic applies equally whether the PBM broadly services a variety of plan clients throughout the State or a single Arkansas plan client (that happens to be its own pharmacy affiliate's employee benefit plan). And that is especially true here given that Walmart is the largest employer in the State, with roughly 60,000 Arkansans on its payroll who will continue to obtain drugs from a Walmart pharmacy.

Third, HB 1150 contravenes the Supremacy Clause because it is preempted under two federal laws. HB 1150 is expressly preempted by the Employee Retirement Income Security Act of 1974 because the law impermissibly interferes with the uniform nationwide

administration of employee benefit plans. *See* 29 U.S.C. § 1144(a). In particular, it unlawfully restricts plan sponsors' discretion and uniform administration by preventing plans from relying on PBM-affiliated pharmacies in Arkansas—including mail-order pharmacies that provide services in every State—to meet their Arkansas participants' needs. For similar reasons, the law is also expressly preempted by the Medicare Prescription Drug Improvement and Modernization Act of 2003 because it prevents Medicare Advantage and Medicare Part D plan sponsors from including PBM-affiliated pharmacies in their pharmacy networks for Arkansas participants, contrary to a number of federal standards that Congress intended to exclusively govern in this area. 42 U.S.C. § 1395w-26(b)(3).

CVS seeks preliminary injunctive relief because it will suffer irreparable harm absent immediate judicial intervention. That harm will take many forms. Most obviously, if the law is permitted to go into effect on January 1, 2026, CVS's 23 retail pharmacies across the State—as well as CVS's specialty pharmacy and mail-order operations—will be unable to operate unless CVS changes its entire business model. If CVS continues to operate its pharmacies in violation of HB 1150, it faces monetary penalties and can be enjoined from operating. *See* Ark. Code Ann. § 17-92-105; *id.* § 17-92-106. And without the ability to fill prescriptions, CVS's retail stores cannot remain open because its retail sales rely on the foot traffic that comes through the door because of its pharmacy business. They will instead be forced to close, sending the more than 500 Arkansans who work at CVS to search for new jobs and severing the tens of thousands of relationships that Arkansans have developed with their CVS pharmacists.

But HB 1150's harms will be felt even sooner than that. For starters, the law requires CVS to notify its patients and doctors that it cannot dispense pharmaceuticals at least sixty days before the law's effective date—*i.e.*, CVS must tell Arkansans by November 2, 2025, that they must look elsewhere for filling their prescriptions. Ark. Code Ann. § 17-92-417(c). At that point, CVS will predictably lose many customers who will look to its competitors to obtain their medicine. Indeed, that has already started to happen. Since the law's enactment to much fanfare by the State, CVS has already lost patients to competitors. That is because many Arkansans understandably think that CVS will need to shutter its operations in the State—after all, that is exactly what HB 1150's supporters promised would happen if the law was enacted. Chip Scarborough, *Arkansas Lawmakers Advance Bill That Could Potentially Eliminate CVS in the Natural State*, 4029 News (Apr. 8, 2025), https://tinyurl.com/bdfvf8pu. This ongoing irreparable harm will simply continue to accumulate every day HB 1150 draws closer to going into effect. *See Iowa Utilities Bd.* v. *FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("[P]otential loss of consumer goodwill qualifies as irreparable harm."); *see also Int'l Franchise Ass'n, Inc.* v. *City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015) ("A rule putting plaintiffs at a competitive disadvantage constitutes irreparable harm.").

In short, HB 1150 puts CVS to a Hobson's choice. CVS can either begin the costly, irreversible process of selling its Arkansas pharmacies now or bet its entire operations in the State on prevailing in this litigation. That is not a choice that the Constitution allows Arkansas to foist upon private parties like CVS. *See Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 220-221 (1994) (Scalia, J., concurring in part and concurring in the judgment)

6

("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."); *see also Texas* v. *EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (same); *Commonwealth* v. *Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (same). Importantly, even if CVS could quantify each of the foregoing losses, sovereign immunity would bar it from recovering damages from the State. *See Alden* v. *Maine*, 527 U.S. 706, 729-31 (1999). That settles the score as far as irreparable harm is concerned, because the Eighth Circuit has recognized that even the mere "threat of unrecoverable economic loss … qualif[ies] as irreparable harm." *Iowa Utilities Bd.*, 109 F.3d at 426.

The balance of hardships and the public interest also favor interim relief. Preliminarily enjoining Defendants from enforcing HB 1150 will simply preserve the status quo while the law's constitutionality is adjudicated. That status quo includes the State's existing authority to enforce Arkansas laws that already perform the work that HB 1150 was purportedly enacted to accomplish—that is, the regulation of PBM reimbursement rates to ensure that PBMs do not treat non-affiliated pharmacies worse than their affiliates. And putting the law on hold would save hundreds of thousands of Arkansans from having to switch pharmacies in a matter of months and preserve critical access to specialty drugs while this litigation is pending.

In short, this law will utterly transforms the pharmacy market in Arkansas. Dozens of pharmacies, including brick-and-mortar pharmacies across the State and many of the most popular mail-order services—all of which currently serve hundreds of thousands of Arkansans—will close overnight if HB 1150 goes into effect. This Court should issue a preliminary injunction to prevent that harm to CVS, other similarly situated out-of-state

7

pharmacies, and Arkansas citizens relying on these pharmacies while the Court determines whether this oppressive and unprecedented law is constitutional.

## BACKGROUND

### A.      The Delivery Of Prescription Drugs To Patients And The Role Of PBMs

Prescription drugs take a number of steps between the manufacturer that produces them and the individuals who take them.  On the distribution side, drug wholesalers purchase such drugs in bulk from the manufacturers who make the drugs, and the wholesalers then sell those drugs to pharmacies (and healthcare providers).  On the patient side, entities such as health plans, unions, private employers, or governments sponsor prescription drug plans that enable their members (or employees) to obtain prescription drugs at agreed rates.  Individuals' prescription orders are filled by pharmacies, which can be brick-and-mortar retail pharmacies, mail-order pharmacies, or specialty pharmacies that provide expensive specialty drugs, which have unique storage or handling requirements, for certain patients with complex, serious, or chronic health conditions.

Pharmacy benefit managers play critical roles between the distribution and patient sides.  PBMs contract with their clients—plan sponsors—to manage their prescription-drug benefits.  As a practical matter, that means that when a member of a PBM client (such as a union or private employer) goes to a pharmacy to fill a prescription, the pharmacy works with the PBM to determine if the drug is covered, and if there is a patient copay under the member's applicable benefit plan.  The pharmacy then fills the prescription with drugs it purchased and obtains reimbursement from the PBM at the contracted rate.

PBMs also set up pharmacy networks.  Under many state laws, including Arkansas's, any pharmacy that wants to participate in a network can do so if it accepts the

8

network's terms and conditions.  *See* Ark. Code Ann. §§ 23-99-203(d), 23-99-204(a)(3).  Pharmacies may agree to participate in networks with lower reimbursement rates in exchange for a greater volume of patients.

Many well-known U.S. companies operate PBMs, including CVS, Cigna, and UnitedHealth Group.  The State of Arkansas itself contracts with a PBM, Navitus Health Solutions, to enable state employees to obtain these beneficial services.  *See, e.g.*, *Employee Benefits:  Pharmacy FAQs: "What is a Pharmacy Benefits Manager,"* Arkansas Dep't of Transformation & Shared Servs., https://transform.ar.gov/employee-benefits/faq/pharmacy.

Approximately 40 PBMs and hundreds of pharmacies—both PBM-affiliated and non-affiliated—compete with one another in Arkansas for clients (PBMs) and patients (pharmacies).  This robust competition has created a thriving market that serves Arkansans and incentivizes pharmacies to produce innovative services and products and keep costs low.  Notably, by CVS's count, 36 of the pharmacies in the State are affiliated with a PBM and affected by the law, and every single one of these companies is an out-of-state entity.

### B.    CVS's Operations in Arkansas

Since 2012, CVS has provided Arkansans with affordable, convenient medicine.  CVS currently employs more than 500 Arkansans to operate 23 retail pharmacies in the State.  CVS also provides Arkansans with medications through specialty pharmacy and mail-order pharmacy services.  CVS Specialty, the specialty pharmacy arm of CVS Health, served more than 10,000 Arkansans last year alone by dispensing, among other drugs, some highly sensitive and expensive drugs that require specialized handling and patient qualification and monitoring requirements.  For that reason, many specialty drug manufacturers allow

9

only certain specialty pharmacies to distribute these drugs under limited-drug-distribution or exclusive-drug-distribution agreements.    Indeed, CVS has been selected by pharmaceutical manufacturers to be the exclusive pharmacy for at least 12 drugs that treat rare diseases such as bladder cancer or connective tissue disorders.  In other words, at this moment, CVS's specialty pharmacies are the only option for patients in Arkansas looking to acquire these drugs.

CVS's PBM, Caremark, has also maintained a robust presence in the State.[1] Caremark serves more than 500 plans that have beneficiaries in Arkansas including many plans that are regulated under ERISA and Medicare.  All in all, roughly 900,000 Arkansans have a plan that contracts with Caremark for PBM services.

C.        **Preexisting Regulation Of PBMs Under Arkansas Law**

Because of PBMs' role in negotiating reimbursement rates for prescription drugs provided by pharmacies to patients, some have expressed concern that PBMs affiliated with pharmacies might favor those pharmacies in setting reimbursement rates.  Because of that concern, Arkansas extensively regulated PBMs long before enacting HB 1150.  In 2015, Arkansas enacted Act 900, which required PBMs to reimburse pharmacies at a price equal to or greater than the cost of the drug to the pharmacy for generic drugs.  Ark. Code Ann. § 17-92-507.  Then in 2018, Arkansas enacted the "Arkansas Pharmacy Benefits Manager Licensure Act."  Under that law, PBMs are subject to supervision by the Arkansas Insurance Commissioner on a range of matters including, among other things, claim

---

[1] Although CVS Caremark (Caremark) is CVS's PBM subsidiary, Plaintiffs will sometimes refer to CVS Caremark as "CVS" solely for convenience.  However, when using Caremark, Plaintiffs refer only to the PBM business.

adjudications, reimbursement rates, and accreditation requirements.  *See id.* § 23-92-506. The Arkansas Pharmacy Benefits Manager Licensure Act also bans PBMs from reimbursing affiliated pharmacies at higher rates than non-affiliated pharmacies. *Id.* § 23-92-506(b)(4)(A).  And in April 2025, Arkansas amended its "Any Willing Provider" law to prohibit PBMs from excluding or discriminating against pharmacies from a health benefit plan if the pharmacy was willing to meet the network's terms and conditions.  *Id.*. §§ 23-99-203(d), 23-99-204(a)(3).

### D.    The Legislative Background of HB 1150

Local pharmacies in Arkansas and their supporters have long complained about out-of-state competitors taking a growing slice of the market.  On January 16, 2025, a group of their allies in the legislature, along with industry interest groups and the state attorney general, announced their support for a new bill, HB 1150, which would prohibit PBMs from owning pharmacies.  Steve Brawner, *Bill Would Prevent PBMs from Dispensing Drugs Via Retail, Mail*, Talk Bus. & Pol. (Jan. 16, 2025), https://tinyurl.com/mut5auur.  They trumpeted the bill as a silver bullet that would help locally owned pharmacies stave off out-of-state competitors.  Senator Moore, who was one of the law's co-sponsors, lauded the bill as a legislative solution to the problem of "neighborhood pharmacies . . . closing at a rapid pace."  Mark Friedman, *Arkansas Bill Would Bar PBMs from Selling Drugs*, Ark. Bus. (Feb. 24, 2025), https://tinyurl.com/atttr4zz.  Monique Whitney of Pharmacists United for Truth & Transparency likewise praised the bill for "ensuring local pharmacies can remain open and accessible to their communities."  Press Release, Pharmacists United for Truth & Transparency, Arkansas' New Bill to Ban PBM-Owned Pharmacies From Operating in

State Is "a Win" for Patients and Local Pharmacists (Jan. 16, 2025), https://tinyurl.com/33pzff9u.

The interest groups supporting the bill did not mince their words at the press conference about the law's target. "I don't see a scenario where any pharmacy . . . is ever going to get a fair contract as long as CVS can steer and fill those prescriptions at their own pharmacy," said John Vinson, CEO of the Arkansas Pharmacist Association. Friedman, *Arkansas Bill, supra.* The lawmakers sang the same tune. Representative Moore identified CVS as the central threat to independent pharmacies in his district. If the State failed to enact HB 1150, he warned, "Arkansas patients would be forced to get their medications from either a mail-order pharmacy or a big box store such as CVS." Maggie Ryan, *Lawmakers Introduce Bill to Ban PBM-Owned Pharmacies*, Little Rock Pub. Radio (Jan. 17, 2025), https://tinyurl.com/5b7y2b3x. He added that the situation would be "untenable" for someone in a district like his which has no CVS but a dozen local pharmacies. *Id.* This bill, according to Moore, would send a message to out-of-state PBM-affiliated pharmacies that they should "[l]eave the medication dispensing to the small businesses that actually care." *Id.*

In the weeks after the press conference, lawmakers continued to sell this bill to the public as an effort to rein in out-of-state national chains like CVS. On a podcast discussing HB 1150, Senator Hammer favorably compared "local independent pharmacies" that are "investing in their communities" and are "there for the long haul" with out-of-state national chains like CVS that do not have deep roots in the State and were quick to "pull[] out" based on financial considerations. Pharmacists United for Truth & Transparency, *Arkansas HB*

12

*1150: Combatting PBM Anticompetitive Practices with State Legislation*, YouTube.com, at 34:29-35:07 (Feb. 2, 2025), https://tinyurl.com/37pbd3c4.  Companies like CVS, he said, were "sucking the economy out" of Arkansas and "sending it somewhere else." *Id.* at 35:01. Representative Achor also said on the same podcast that he "love[d] that this [bill] is not really a negotiation" with the PBM-affiliated pharmacies because those companies "have no remorse." *Id.* at 14:33-14:44.

But there was a problem with the bill—one that is often a fatal flaw in Arkansas.  As originally drafted, the bill covered Walmart, the State's largest employer and owner of over 100 retail pharmacies in Arkansas.  The bill prohibited PBMs and also "[h]ealthcare payor[s]" from holding a pharmacy permit.  H.B. 1150, 95th Gen. Assemb., Reg. Sess. § 2(b) (Ark. 2025) (as proposed on Jan. 16, 2025).  "Healthcare payor" was defined with reference to Ark. Code Ann. § 23-92-503, which in turn defined the term as "an entity that provides or administers a self-funded health benefit plan, including a governmental plan." H.B. 1150 § 2(a)(1)(A) (Jan. 16, 2025 draft).  In other words, no entity with a self-funded health plan could have a pharmacy permit. But Walmart had both.  For some lawmakers, that was a dealbreaker.  Senator Jonathan Dismang, for instance, stated that he could not support the original version of the bill in part because it would have prevented businesses like Walmart from operating pharmacies.  *See* Greg Geary, *Small Pharmacies in Danger of Closing if PBM Bill Doesn't Pass, State Representative Says*, White Cnty. Citizen (Mar. 27, 2025), https://tinyurl.com/bdennnse.

To fix this problem, the bill's architects rewrote HB 1150.  H.B. 1150 § 2(b) (Mar. 12, 2025 draft).  To eliminate any risk that the law would still cover local interests, the

13

legislature introduced an exemption to carve out Walmart by clarifying that the law did not apply to a PBM that served only the pharmacy's own employee benefit plan. H.B. 1150 § 2(f) (Mar. 18, 2025 draft). After these changes were made, Representative Jim Wooten, a co-sponsor of the bill, could address his colleagues' concerns about the law impacting Walmart by explaining "they got that corrected" by amending HB 1150. Geary, *Small Pharmacies, supra.*

Despite "correcting" the problem for Walmart, legislators continued emphasizing the need to prop up local pharmacies under "siege." On March 17, 2025, Senator Sullivan described the bill as "protect[ing] competition so local pharmacies can keep serving their communities." Dan Sullivan, *HB1150 Puts Pharmacy Patients, Quality Care First*, Jonesboro Sun (Mar. 17, 2025), https://tinyurl.com/y8njmynd. Representative Wooten took his case to the public, explaining that without the bill "what we're going to wind up with is several counties that don't have pharmacies." *Id.* And in a House Insurance and Commerce Committee hearing on April 2, 2025, Representative Robin Lundstrum expressed concern that PBMs were terrifying "the small-town pharmacists." *Hearing Before the Arkansas House Insurance and Commerce Committee*, Apr. 2, 2025 at 11:55:56 AM, https://tinyurl.com/2c23k6bv. Representative Richard McGrew echoed those concerns, warning that the local pharmacies in his district had told him they would be forced out of business unless the State intervened. *Id.* at 11:40:40 AM.

Local pharmacies and interest groups also rallied behind the bill. In that same April 2 hearing, Vinson testified that it was his hope that HB 1150 would bring back all the independent pharmacies that the community had lost. *Id.* at 11:47:30 AM, 11:52:40 AM.

14

As he saw it, "there are . . . somewhere between two billion and five billion dollars of prescriptions" that go to "out-of-state mail-order pharmacies . . . that should be able to be filled locally." *Id.* at 11:31:52 AM. At a House floor session on April 3, Representative Brandon Achor—who personally owns 13 independent pharmacies in Arkansas—also invoked his experience as a local pharmacist in selling this bill as a means of protecting local pharmacies because they are "exceptionally at risk." *Arkansas House of Representatives Floor Session*, Apr. 3, 2025 at 3:56:10 PM, https://tinyurl.com/mr2ahke8. Similarly, Representative Joey Carr described his discussions with local pharmacists who feared that they were "on the brink of going out of business." *Id.* at 4:01:12 PM. The subsequent week in an April 9 Senate floor session, Senator Hammer, another co-sponsor of HB 1150, warned his colleagues that if they "don't do something," independent pharmacies would continue to be "put out of business under the current structure." *Arkansas Senate Floor Session*, Apr. 9, 2025 at 3:32:18 PM, https://tinyurl.com/y7fj53m5. Representative Moore summed up his case for HB 1150 by promising that the law would bring "justice for patients, taxpayers, and local pharmacies." Neal Earley, *Sanders Signs Bill Opposed by CVS; Measure Prohibits Prescription Drug Middlemen from Owning Pharmacies*, Ark. Democrat-Gazette (Apr. 16, 2025), https://tinyurl.com/b7vsf6nt.

The bill's critics charged that the law would harm local communities that relied on CVS and other national chains. Senator Fredrick Love, for instance, stated, "Now we're going to say we're going to put pharmacies out of business? . . . And maybe you all do have local pharmacies and good for your communities, but I don't have any local pharmacies, and my people need CVS." *Senate Floor Session* (Apr. 9, 2025), *supra*, at 3:54:10 PM. HB 1150,

15

he warned, would "put[] people out of work" and "disenfranchis[e] people that really need their medicine." *Id.* at 3:54:40. Similarly, Sharon Faust, Chief Pharmacy Officer for Navitus Health Solutions—the PBM the State itself uses for its own employees—warned that dozens of out-of-state pharmacies would be "going out of business" as a direct result of the bill. *House Insurance and Commerce Hearing* (Apr. 2, 2025), *supra*, at 12:41:36 PM. Representative Carol Dalby warned that her district might become a pharmacy desert because it had only three pharmacies and one of those pharmacies would lose its permit under the Act. *Id.* at 11:46:20 AM.

Dalby and others also saw the bill as a protectionist measure (though they considered that a bug, rather than a feature). At the April 2 hearing, Dalby wondered why such heavy-handed legislation did "not conflict with the Commerce Clause in the U.S. Constitution." *Id.* at 11:23:30 AM. At the April 8, 2025, hearing of the Senate Insurance and Commerce Committee, Senator Missy Irvin denounced HB 1150 as an abuse of the state's licensing power to get rid of national competition for the benefit of in-state pharmacies. She criticized the Act's supporters for using legislation to improperly pick "winners and losers." *Hearing Before the Arkansas Senate Insurance and Commerce Committee,* Apr. 8, 2025 at 11:13:49 AM, https://tinyurl.com/fkphttee. Randy Zook, President of the Arkansas Chamber of Commerce, testified that the bill would "unjustly" punish out-of-state pharmacies who had made "good-faith business investments in our state," and that HB 1150 could only be understood as "a punitive measure to remove competition from the market" given that Arkansas already has "regulations on the PBM industry to prevent predatory practices such as paying an affiliate pharmacy more than

16

other pharmacies; from steering patients to affiliated pharmacies, including mail-order pharmacies; and from paying below the national average drug acquisition cost." *Id.* at 11:39:12-11:41:04 AM.

### E.     House Bill 1150 As Enacted

On April 16, 2025, Governor Sanders signed HB 1150—"An Act To Prohibit A Pharmacy Benefits Manager From Obtaining Certain Pharmacy Permits; And For Other Purposes"—into law as Act 624.  HB 1150's legislative findings state that "[i]t is the intent of the General Assembly . . . [to] improve healthcare delivery in the pharmacy market for patients by eliminating certain anticompetitive business tactics."  Act 624 § 1(b).  The statutory findings assert that PBMs serve as both a "price setter and price taker," and that these allegedly "anticompetitive business tactics . . . have driven locally-operated pharmacies out of business, limiting patient choices and inflating drug prices at pharmacies owned by [PBMs]." *Id.* § 1(a).  Indeed, the law characterizes PBMs as operating like a "fox guarding the henhouse" when the PBM negotiates with its affiliated pharmacy.

To implement these purported findings, Section 2 of the Act adds two new sections to Title 17 of the Arkansas Code.  The first, Ark. Code Ann. § 17-92-416, describes the new limitations that will be placed on the availability of pharmacy permits in the state.  The second, Ark. Code Ann. § 17-92-417, outlines related notice requirements.

The Act declares that "[a] pharmacy benefits manager shall not acquire a direct or indirect interest in, or otherwise hold, directly or indirectly, a permit under § 17-92-405 for the retail sale of drugs or medicines in this state," and requires that the Board of Pharmacy "shall either revoke or not renew a permit of an entity that violates this section" after the Act goes into effect on January 1, 2026.  Ark. Code Ann. § 17-92-416(b), (c).

17

The Act also provides the Board of Pharmacy with temporary authority to assess the need for "limited use permits" for "rare, orphan, or limited distribution drugs" and issue those permits to otherwise prohibited pharmacies under the Act.  Ark. Code Ann. § 17-92-416(d)(1), (2)(A)(i), (3)(A).  This authority, however, expires on September 1, 2027, and there is no mechanism for the Board to push back that date.

The Act also contains two notice requirements.  At least 90 days before January 1, 2026—and at any point beginning on July 1, 2025—Section 17-92-417 requires the Board of Pharmacy to assess each active retail pharmacy permit and send written notice to each pharmacy permit holder that will violate HB 1150.  At least 60 days before January 1, 2026, each pharmacy that received notice from the Board of Pharmacy must notify each patient and prescribing healthcare provider that used the pharmacy within the last 12 months that the pharmacy will no longer be able to dispense retail drugs on or after January 1, 2026.  *Id.* § 17-92-417(c).  Given these notice requirements, PBM-affiliated pharmacies and their Arkansan customers will begin to feel the impact of HB 1150 in a matter of months.

### F.      House Bill 1150's Impact

HB 1150 will transform the pharmacy market in Arkansas, expelling virtually all PBM-affiliated pharmacies.  Every single CVS-affiliated pharmacy will shut down and the vast majority of mail-order pharmacies that operate in the State will cease operations.  Post-enactment media coverage understood the law as a targeted strike against CVS and other out-of-state pharmacies.  One article, entitled *Sanders Signs Bill to Strip CVS and Other PBMs of Pharmacy Licenses in Arkansas*, quoted Governor Sanders:  "These massive corporations are attacking our state because we will be the first in the country to hold them accountable for their anticompetitive actions."  Benjamin Hardy, *Sanders Signs*

18

*Bill to Strip CVS and Other PBMs of Pharmacy Licenses in Arkansas*, Ark. Times (Apr. 16, 2025), https://tinyurl.com/sw9c9p72. Moreover, the Arkansas Pharmacists Association and related groups, which primarily represent local pharmacies, celebrated the protectionist law's enactment by posting on its social media accounts the hashtags "#SupportLocalPharmacies" and "#ProtectLocalPharmacy." *See* Arkansas Pharmacists Ass'n (@arkpharm), Instagram (Apr. 18, 2025), https://tinyurl.com/35aydntc; RXReformNow (@RXReformNow), Twitter (Feb. 6, 2025, 1:02 PM), https://tinyurl.com/yc3t47pe. One post by the group applauded Governor Sanders for "sending a clear message" to PBMs and holding them accountable for practices that ostensibly "hurt local pharmacies." *See* Arkansas Pharmacists Ass'n (@arkpharm), *supra*.

The consequences of this law will also impact countless Arkansans. In 2024, for instance, CVS's retail locations alone filled more than 2.7 million prescriptions for more than 340,000 patients in the State. Over 20,000 Arkansans also relied on mail-order deliveries from CVS Caremark for over 278,000 mail-order prescriptions. In a matter of months, if HB 1150 goes into effect, these patients will have to find new pharmacies to fulfill their prescriptions, potentially derailing their adherence to their medication regimens.

Other patients will suffer even more acute harms, because CVS Specialty—which served more than 10,000 Arkansans and filled over 70,000 prescriptions last year alone— offers rare drugs that are not easy to find elsewhere in the State. Patients often rely on CVS Specialty to obtain specialty drugs that are used for treating serious, chronic diseases. Indeed, roughly a third of the prescriptions filled by CVS Specialty in Arkansas last year were for limited distribution drugs (LDDs), which are drugs that are distributed by 10 or

19

fewer pharmacies in the State. These drugs help patients with serious, life-altering diseases such as cancer, multiple sclerosis, and hemophilia.

CVS is also the exclusive distributor of 12 specialty medications. That means no other pharmacy in the country, much less the State, can distribute these EDDs. These drugs include both Balversa, which is a drug for treating bladder cancer, and Xiaflex SDV, which treats a connective tissue disorder. In the past year, 5 patients in Arkansas obtained Balversa from CVS pharmacies and 68 patients obtained Xiaflex SDV. Other drugs on this list include Rivloza, which treats renal disease, and Skysona, which treats certain neurological disorders. Like LDDs, many EDDs can only be handled by trained staff under tightly controlled conditions that retail pharmacies cannot provide.

Retail pharmacies cannot step in for these specialty pharmacies because they lack the staff, resources, or facilities to provide the same services as specialty pharmacies. Many of these LDD and EDD drugs are highly sensitive and require careful handling by trained staff at specialized facilities. In addition, CVS's specialty pharmacy provides around-the-clock patient-support services in multiple languages, Braille labels for blind patients, coordinated nursing services, educational services, and an extensive inventory. CVS's specialty pharmacy staff, unlike staff at ordinary retail pharmacies, are required to possess extensive training focused on rare diseases and improving care coordination for challenging patients.

If CVS is forced to leave the State, Arkansans who need these rare drugs will need to find another pharmacy that has entered into a distributor agreement. But manufacturers tend to favor a limited distribution network for EDDs and LDDs on the view

20

that high-risk patient population outcomes are improved when only credentialed and compliant pharmacies can dispense the drugs. And many specialty pharmacies are PBM-affiliated. Indeed, as Governor Sanders acknowledged in a recent opinion editorial, PBM-affiliated pharmacies provide 70% of the country's specialty drugs. If these pharmacies cannot dispense drugs in the State, then it will become much more difficult for Arkansans to obtain the rare, critical medicine that cannot be found in an ordinary retail pharmacy. *See* Sarah Huckabee Sanders, Opinion, *My State Is Taking on the Middlemen Who Inflate Drug Prices*, N.Y. Times (June 10, 2025), https://tinyurl.com/563sanca.

## ARGUMENT

To warrant preliminary injunctive relief, a movant must establish (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter* v. *NRDC*, 555 U.S. 7, 20 (2008); *S.J.W. ex rel. Wilson* v. *Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 775 (8th Cir. 2012). The first factor is the "most significant." *Wilson*, 696 F.3d at 775. "The balance-of-harms and public-interest factors merge when the Government is the [nonmoving] party." *Eggers* v. *Evnen*, 48 F.4th 561, 564-565 (8th Cir. 2022) (quoting *Nken* v. *Holder*, 556 U.S. 418, 435 (2009)). No single factor is "dispositive" in this analysis, *Ng* v. *Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023), but here, each of these factors strongly warrants granting the requested relief. The Court therefore should preliminarily enjoin the enforcement of HB 1150.

## I.      PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS.

The most significant factor for preliminary injunctive relief is likelihood of success on the merits, and CVS easily clears that bar here. Indeed, Plaintiffs do not need to "prove

21

a greater than fifty per cent likelihood that [they] will prevail on the merits." *Jet Midwest Int'l Co., Ltd.* v. *Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044-1045 (8th Cir. 2020) (citation and quotation marks omitted).  Instead, a plaintiff need only "show a fair chance of prevailing." *Id.* (citation and quotation marks omitted).  That is an intentionally modest bar that reflects the status-quo-preserving role that a preliminary injunction plays when regulated parties face the risk of irreparable harm from the enforcement of an unconstitutional state law.  *See University of Texas* v. *Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties.").

That showing is readily satisfied here because HB 1150 is saturated with legal infirmities.  The law violates the Dormant Commerce Clause and the Equal Protection Clause, and it is preempted by at least two federal statutes.

## A.      HB 1150 Violates the Dormant Commerce Clause.

The Commerce Clause provides Congress with a "positive grant" of authority "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3; *Comptroller of Treasury of Md.* v. *Wynne*, 575 U.S. 542, 548 (2015).  The Supreme Court has also repeatedly held that the Clause has a "further, negative command," *Nat'l Pork Producers*, 598 U.S. at 368, that "prevents the States from adopting protectionist measures" against interstate commerce "even when Congress has failed to legislate on the subject."  *Tenn. Wine & Spirits Retailers Ass'n* v. *Thomas*, 588 U.S. 504, 514 (2019); *Nat'l Pork Producers*, 598 U.S. at 368.

22

The Dormant Commerce Clause has been a critical pillar of this Nation's unrivaled economic growth.  Under the Articles of Confederation, "each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents." *Camps Newfound/Owatanna, Inc.* v. *Town of Harrison*, 520 U.S. 564, 571 (1997).  But this latitude proved self-destructive because the States were trapped in a protectionist race to the bottom that "cut[] off the very life-blood of the nation." *Tenn. Wine & Spirits*, 588 U.S. at 515 (quotation and citation marks omitted).  The removal of "state trade barriers" thus became "a principal reason for the adoption of the Constitution." *Id.* at 515-516.  And the Framers maintained "the conviction" that the Union would only succeed if it could "avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Granholm* v. *Heald*, 544 U.S. 460, 472 (2005) (citation omitted).  If States could choke the interstate flow of goods and services by erecting trade barriers against one another, "we would be left with a constitutional scheme that those who framed and ratified the Constitution would surely find surprising." *Tenn. Wine & Spirits*, 588 U.S. at 515.

HB 1150 violates established Dormant Commerce Clause principles in two different ways.  First, the law represents an impermissible effort by Arkansas to protect its local pharmacies from out-of-state competition.  Second, any putative in-state benefits that the law produces within Arkansas are substantially outweighed by the onerous burdens that HB 1150 imposes on CVS and other out-of-state PBM-affiliated pharmacies, not to mention the hundreds of thousands of Arkansans who rely on these pharmacies for critically needed medicine.

### 1.    HB 1150 discriminates against out-of-state pharmacies.

More than a century of settled Supreme Court precedent has made clear that the State may not use "its regulatory power to protect its own citizens from outside competition." *Lewis* v. *BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980). Thus, "a virtually *per se* rule of invalidity" applies "where simple economic protectionism is effected by state legislation." *City of Philadelphia* v. *New Jersey*, 437 U.S. 617, 624 (1978); *see Nat'l Pork Producers*, 598 U.S. at 364 ("[N]o State may use its laws to discriminate purposefully against out-of-state economic interests."). A discriminatory law "will be invalidated unless the state can show, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *IESI AR Corp.* v. *Northwest Arkansas Regional Solid Waste*, 433 F.3d 600, 604 (8th Cir. 2006) (citation and quotation marks omitted).

Discrimination in this context "means differential treatment of in-state and out-of-state interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc.* v. *Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994). The Eighth Circuit "recognizes three indicators of discrimination against interstate commerce": discrimination that appears on the law's face, in its purpose, or in its effects. *Smithfield Foods, Inc.* v. *Miller*, 367 F.3d 1061, 1065 (8th Cir. 2004) (internal citations omitted). Because it is the rare state law which facially discriminates against out-of-state commerce, a broad evidentiary inquiry is often required to assess whether a state law "discriminates based on purpose or effect." *IESI AR*, 433 F.3d at 604; *see Dean Milk Co.* v. *City of Madison*, 340 U.S. 349, 354 (1951) (recognizing that a prohibition on protectionist laws would be of little value if it were limited to "the rare instance where a state artlessly discloses an avowed purpose to discriminate

24

against interstate goods"). In conducting that inquiry, courts consider, among other things, "statements by lawmakers," "the sequence of events preceding the regulation's adoption," and whether the law uses "highly ineffective means to promote the legitimate interest asserted by the state." *IESI AR*, 433 F.3d at 604. Even a facially neutral law adopted with no apparent discriminatory motive is impermissible if the record shows that the law awarded a "competitive advantage" to in-state businesses or changed the "relative proportions of local and out-of-state goods sold in [the State]." *Exxon Corp.* v. *Governor of Maryland*, 437 U.S. 117, 126 & n.16 (1978).

The practical effects of HB 1150 unequivocally demonstrate that the law discriminates against out-of-state pharmacies. In fact, HB 1150 applies *only to pharmacies owned by out-of-state companies*: the only PBM-affiliated pharmacies that the law will bar from operating in Arkansas are out-of-state national entities like CVS, Cigna, and UnitedHealth Group. On the flip side of the coin, *no* in-state pharmacies will be affected. Indeed, the Arkansas legislature specifically ensured that would be true when it amended the original draft of HB 1150 to carve out Walmart from its application. While admittedly not the "rare instance" of a facially discriminatory law, HB 1150 achieves its discriminatory *effects* with equally rare precision.

Unsurprisingly, by barring only pharmacies owned by out-of-state companies from operating in Arkansas, HB 1150 generates a significant windfall for in-state pharmacies. The hundreds of thousands of Arkansas patients who have relied on CVS and other out-of-state pharmacies for medicine will be up for grabs. In the hypercompetitive pharmacy market, this is a once-in-a-decade market opportunity. In 2024, CVS filled more than 2.7

25

million prescriptions for more than 340,000 Arkansans across its 23 retail pharmacies. ESI, another affected out-of-state PBM-affiliated pharmacy that has sued to challenge HB 1150, has represented that it serviced 45,000 Arkansans in 2024. In-state pharmacies are eager to fill this vacuum. Indeed, since mid-March 2025, Walmart has received nearly twice as many prescriptions transferred from CVS retail pharmacies as from CVS's next closest competitor. *See Walmart Expands Pharmacy Central Fill Operations with Opening of Largest Facility Yet in Frederick, Maryland*, Walmart (May 22, 2025), https://tinyurl.com/yzjv5jxy. HB 1150 thus paves the way for Walmart and other in-state pharmacies to increase their market share overnight.

Courts have readily found other facially neutral laws with substantial discriminatory effects to violate the Dormant Commerce Clause. *See Cloverland-Green Spring Dairies, Inc.* v. *Penn. Milk Mktg. Bd.*, 298 F.3d 201, 211 (3d Cir. 2002) ("[I]t is clear that state laws that are facially neutral but have the effect of eliminating a competitive advantage possessed by out-of-state firms trigger heightened scrutiny."). In *Hunt* v. *Washington State Apple Advertising Commission*, for example, the Supreme Court struck down a North Carolina statute that prohibited apple vendors from using any grades other than the U.S. Department of Agriculture's standards. 432 U.S. 333 (1977). The Court invalidated that law under the Dormant Commerce Clause because it prevented apple growers from Washington State, which imposed famously stringent inspection and quality standards, from using their superior grading system to market their produce. *Id.* at 336-339, 352-353. The labeling rule impermissibly "level[ed]" the playing field by affording "the North Carolina apple industry the very sort of protection against competing with out-of-state

products that the Commerce Clause was designed to prohibit." *Id.* at 351. That reasoning applies with even greater force here, because HB 1150 does not merely raise the costs for out-of-state businesses: It excludes out-of-state pharmacies like CVS's from competing in the marketplace altogether, without affecting a single Arkansas-based counterpart.

The courts of appeals have likewise recognized that facially nondiscriminatory laws cannot survive the Dormant Commerce Clause's strictures if the law's practical effects disproportionately fall on out-of-state interests. In *Cachia* v. *Islamorada*, for instance, the Eleventh Circuit allowed a Dormant Commerce Clause challenge to proceed against a facially neutral ordinance that prohibited chain restaurants from opening in Islamorada. 542 F.3d 839, 844 (11th Cir. 2008). Although the ordinance allowed some out-of-state restaurants to enter the local market, the Eleventh Circuit recognized that the ordinance's prohibition on national chains "is not evenhanded in effect[] and disproportionately targets restaurants operating in interstate commerce." *Id.* at 843. Likewise in *Family Winemakers of California* v. *Jenkins*, the First Circuit enjoined a facially neutral Massachusetts statute that allowed "small" wineries to sell directly to consumers while prohibiting "large" wineries—which happened to cover only out-of-state entities—from doing the same. 592 F.3d 1, 4 (1st Cir. 2010). The court concluded that the statute was "impermissibly discriminatory in effect" because it "artificially limit[ed] the playing field in this market in a way that enable[d] Massachusetts's wineries to gain market share against their out-of-state competitors." *Id.* at 12-13. In short, when a state law, like the one here, imposes an obvious and significant barrier that applies largely—or here, *exclusively*—

27

against out-of-state economic actors, the Constitution deems that law virtually *per se* invalid.

Although its exclusively discriminatory effects are enough to deem the statute unlawful, HB 1150 violates the Dormant Commerce Clause for the additional independent reason that it was "enacted for protectionist purposes." *Bacchus Imports, Ltd.* v. *Dias*, 468 U.S. 263, 272 (1984). The Supreme Court has "consistently found parochial legislation" that aimed "to create jobs by keeping industry within the state" unconstitutional. *Chemical Waste Mgmt., Inc.* v. *Hunt*, 504 U.S. 334, 341 (1992). The record of HB 1150's enactment is rife with evidence that HB 1150 was enacted for the impermissible purpose of favoring in-state pharmacies at the expense of out-of-state chains like CVS.

Many discriminatory-intent cases are difficult because the lawmakers strenuously deny that animus played any role in the statute's enactment. This one is easy because the statute's advocates proudly trumpeted their protectionist motives. One supporter of the bill after another publicly and repeatedly sold this bill to the public as an effort to protect Arkansas's "locally-operated pharmacies" from out-of-state competitors such as CVS, Cigna, and UnitedHealth Group. Even a glancing familiarity with the HB 1150 debate makes this clear:

- Senator Sullivan: The focus of the bill is to "protect competition so local pharmacies can keep serving their communities." Sullivan, *HB1150 Puts Pharmacy Patients, Quality Care First*, *supra*.

- Representative Moore: The bill sent a signal that out-of-state pharmacies like CVS should "[l]eave the medication dispensing to the small businesses

28

that actually care." Ryan, *Lawmakers Introduce Bill to Ban PBM-Owned Pharmacies*, *supra*.

- Senator Hammer: If the legislature does not "do something," independent pharmacies would continue to be "put out of business under the current structure." *Senate Floor Session* (Apr. 9, 2025), *supra*, at 3:32:18 PM.

- Representative McGrew: If this bill does not pass, then "pretty soon all of us small businesses would be out, and then we would have just one big one, and we know what's going to happen to the prices then." *House Insurance and Commerce Committee Hearing* (Apr. 2, 2025), *supra*, at 11:41:18.

The State's local pharmacies recognized the goal as well: Like the North Carolina apple producers in *Hunt*, the Arkansas local pharmacies pushed for HB 1150's enactment to fend off out-of-state competition. For example, John Vinson, CEO of the Arkansas Pharmacists Association, stated that he hoped HB 1150 would bring back independent pharmacies that the community had lost, and he identified CVS as a threat to those businesses. *See House Insurance and Commerce Committee Hearing* (Apr. 2, 2025), *supra*, at 11:47:30 AM, 11:52:40 AM; Friedman, *Arkansas Bill, supra*.

That the legislature was motivated by an unlawfully discriminatory purpose in enacting HB 1150 is confirmed by the plainly pretextual nature of the law's professed aim to tackle the supposed price-fixing and inflation that results from a PBM negotiating with its affiliated pharmacy as compared to a local unaffiliated one. But real-world facts disprove this contention. National figures show that PBMs tend to pay nonaffiliated pharmacies *more* than their affiliates. *See* Press Release, PCMA, Updated Comprehensive Analysis

29

from Leading Economists Confirms PBMs Deliver Value for Plan Sponsors, Support Pharmacies (Apr. 30, 2025), https://tinyurl.com/3fnw88zf; *see also* Dennis W. Carlton et al., *PBMs and Prescription Drug Distribution:  An Economic Consideration of Criticisms Levied Against Pharmacy Benefit Managers* (Apr. 2025), https://tinyurl.com/5e9cuyxx. And that is true for CVS too.  Caremark pays CVS pharmacies at a *lower* rate than nonaffiliated pharmacies both across the country and in Arkansas in particular.  Moreover, HB 1150's carveout for Walmart flatly undermines the law's purported rationale.  If the State was genuinely concerned about PBM price-setting, then it would make no sense for HB 1150 to exempt PBM-affiliated pharmacies that serve only the pharmacy's own employee benefit plan.  After all, under the law's professed rationale, Walmart's employees—who number roughly 60,000 in Arkansas alone—would also supposedly suffer from the "price inflation" HB 1150 purports to combat.

Moreover, to the extent there are real problems posed by PBMs, Arkansas has already passed other laws to address them, such as its "Any Willing Provider" law prohibiting PBMs from arbitrarily excluding certain pharmacies from its network.  Ark. Code Ann. §§ 23-99-203(d), 23-99-204(a)(3).  Indeed, state law already prohibits PBMs from paying nonaffiliated pharmacies at a lower rate than the PBM's affiliates.  *Id.* § 17-92-507. And PBMs are also subject to extensive supervision by the Arkansas Insurance Commissioner in matters such as, among other things, reimbursement rates, claim adjudications, and accreditation requirements for their pharmacists.  *See id.* § 23-92-506. So to the extent the State has an actual interest in regulating PBMs, it has already shown

30

that it has plenty of "other means to advance" that interest. *IESI AR*, 433 F.3d at 604 (citation and quotation marks omitted).

### 2. HB 1150 flunks the *Pike* balancing test.

HB 1150 is plainly discriminatory in both effect and purpose, but even if that were not true, the law would still be unconstitutional. That is because even a nondiscriminatory law violates the Dormant Commerce Clause if the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church*, 397 U.S. 137, 142 (1970); *Nat'l Pork Producers*, 598 U.S. at 394 (Roberts, C.J., concurring). If "a legitimate local public interest" is found, its significance will depend on "whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142. In short, even a regulation that is genuinely motivated by a legitimate local purpose "may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause." *Kassel* v. *Consolidated Freightways Corp.*, 450 U.S. 662, 670 (1981) (plurality opinion); *see U & I Sanitation* v. *City of Columbus*, 205 F.3d 1063, 1072 (8th Cir. 2000) (finding that a local ordinance failed the *Pike* balancing test).

HB 1150 fails that balancing test because the law imposes draconian burdens on certain out-of-state pharmacies, and the putative local interests supporting HB 1150 are illusory and already addressed by other means. On one side, there can be no dispute that the law imposes substantial burdens on interstate commerce (i.e., out-of-state pharmacies operating in Arkansas). The law forces PBM-affiliated pharmacies to cease all operations in the State, and that ban will apply *only* to out-of-state pharmacies. If the law takes effect,

31

CVS alone will have to shutter its 23 retail pharmacies along with its specialty pharmacy and mail-pharmacy operations. The act is estimated to cost CVS more than $100 million from asset impairment and annual loss of income. Moreover, there is a serious possibility that CVS may be unable to remain the exclusive distributor for certain specialty drugs if it cannot guarantee that it can deliver these drugs to patients anywhere in the nation. Other major out-of-state entities like Cigna and UnitedHealth Group that will be affected by HB 1150 will likely incur similar burdens.

It gets worse. These burdens to interstate commerce are bad enough when limited to Arkansas, but they will compound if other States follow Arkansas's lead. *See Healy* v. *Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("[T]he practical effect of the statute must be evaluated" by considering "what effect would arise if not one, but many or every, State adopted similar legislation"). If each of the 50 States (or even a material number) were to adopt some variation of this law, the pharmacy landscape across the Nation would look much more parochial. Each jurisdiction would find some proxy for expelling national pharmacy chains based out of state while gerrymandering its exceptions to protect the leading local pharmacies. Such "economic Balkanization" is exactly what the Dormant Commerce Clause is intended to protect. *Granholm*, 544 U.S. at 472.

On the other side of the *Pike* balance, Arkansas has pointed to no legitimate purposes advanced by the law that could justify such excessive burdens on interstate commerce. As explained above, it is hard to take seriously the law's professed interest in avoiding price inflation due to PBM affiliation when the law surgically carves out 60,000 Walmart employees in Arkansas from that protection. In any event, Arkansas has plenty

32

of other means of advancing its purported purpose that would have a far "lesser impact on interstate activities." *Pike*, 397 U.S. at 142. The State already has laws in place that extensively regulate PBMs, *supra*, at 28-29, and it could pass more antidiscrimination laws regulating PBM interactions with non-affiliated pharmacies if it believes existing laws are inadequate. The path that the State chose instead—the forced expulsion of Arkansas's most popular retail chain along with several other leading out-of-state pharmacy enterprises—may benefit the pockets of in-state pharmacies, but it cannot survive constitutional scrutiny.

*    *    *

If HB 1150 is upheld, then Arkansas will have created a blueprint for States to evade the Dormant Commerce Clause's antidiscrimination principle. A State could engage in blatant protectionism so long as the legislature was savvy enough to cloak it by regulating some proxy for out-of-state competition such as a particular form of corporate structure. That cannot be right. The marketplace, and not state legislatures or state interests, should decide which companies succeed when they provide the same goods or services in the same marketplace. The Constitution demands no less.

### B.    HB 1150 Violates the Equal Protection Clause.

Even if it were true that the Arkansas legislature had no discriminatory motive and HB 1150 does not impermissibly burden interstate commerce, the law still would not pass constitutional muster because it represents an arbitrary legislative classification with no sufficient justification. The Equal Protection Clause of the Fourteenth Amendment protects all individuals and entities from unjust discrimination by state governments. *See Mathers* v. *Wright*, 636 F.3d 396, 402 (8th Cir. 2011). When the government singles out

33

particular private entities for adverse treatment, it must articulate a constitutionally legitimate justification for treating them differently from similarly situated entities. *Vill. of Willowbrook* v. *Olech*, 528 U.S. 562, 564 (2000) (per curiam). The justification cannot be arbitrary, irrational, or pretextual. A "bare . . . desire to harm a politically unpopular group" does not count as a "legitimate state interest[]." *City of Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 447 (1985).

HB 1150 fails to live up to these principles because there is no rational reason for the State to ban PBM-affiliated pharmacies on the ground that they negatively impact prescription drug prices while simultaneously exempting from that ban a PBM that only caters to its affiliated pharmacy's employee benefit plan. Under the State's theory, PBMs engage in price-fixing with their affiliated pharmacies because they operate like the proverbial "fox guarding the henhouse" by serving as "both a price setter and price taker." Even if that premise were true (despite all the evidence to the contrary), then Arkansas has not offered any legitimate justification for excluding from an otherwise categorical ban one particular category of PBM-affiliated pharmacies.

The record supports only one explanation for this otherwise inexplicable distinction. Arkansas lawmakers designed this exemption for the express purpose of carving out Walmart. Absent this exemption, these lawmakers feared, HB 1150 would treat Walmart in the same way as CVS and other major out-of-state PBM-affiliated pharmacies: *i.e.*, it would ban Walmart from operating pharmacies in its home state of Arkansas. Indeed, one lawmaker publicly explained that the bill, in its original form, was a nonstarter in his view because it would have precluded Walmart from operating pharmacies. *See* Steve Watts &

Wendy Jones, *State Legislators From White County Discuss Challenges PBMs Bill Faces Despite Finally Making It Out Of Committee*, White Cnty. Citizen (Apr. 3, 2025), https://tinyurl.com/4ewb8y75.

But such equal footing is exactly what the Constitution demands. The true explanation for HB 1150's differential treatment, as discussed above, was the State's goal to promote Arkansas-based pharmacies at the expense of their out-of-state competitors. But absent that illegitimate consideration, Arkansas has no justification for its arbitrary decision to bar CVS pharmacies while exempting Walmart pharmacies.

### C.    HB 1150 Is Preempted By Federal Law.

As an additional constitutionally based deficiency in HB 1150, the law impermissibly conflicts with federal law. It is well settled that the Supremacy Clause gives Congress "the power to preempt state law." *Arizona* v. *United States*, 567 U.S. 387, 399 (2012). Federal preemption of state law may be either express or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (internal quotation marks omitted).

Because of its extensive impact on the pharmacy and prescription drug industries, HB 1150 is preempted by multiple sources of federal law. In particular, the law is preempted by the Employee Retirement Income Security Act of 1974 and the Medicare Prescription Drug Improvement and Modernization Act (MMA) of 2003. When Congress enacts an express preemption clause, federal courts must set aside any presumption against preemption and instead give full meaning to Congress's deliberate decision to employ capacious language. *See Chamber of Com. of United States of America* v. *Whiting*, 563 U.S.

35

582, 594 (2011) (where the statute contains an express preemption clause, courts must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's preemptive intent").  Both ERISA and the MMA contain broadly worded express preemption clauses that must be given broad effect.  As such, CVS can, at a minimum, make a fair showing that it will prevail in establishing that (1) HB 1150 is preempted by ERISA because it is a law that "relates to" employee benefit plans and (2) HB 1150 is preempted by the MMA because it impermissibly attempts to regulate Medicare Advantage and Medicare Part D plans which Congress intended for federal standards to exclusively govern.  42 U.S.C. § 1395w-26(b)(3).

### 1.    HB 1150 is preempted by ERISA.

Congress enacted ERISA to provide "a uniform regulatory regime over employee benefit plans." *Aetna Health Inc.* v. *Davila*, 542 U.S. 200, 208 (2004).  The law regulates employee pension plans and benefits such as medical insurance "by establishing standards of conduct, responsibility, and obligations" for plan fiduciaries and by making these obligations judicially enforceable.  *See* 29 U.S.C. § 1001(b).  ERISA does not require "employers to provide any given set of minimum benefits, but instead controls the administration of benefit plans." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 651 (1995).

To "ensure that plans and plan sponsors would be subject to a uniform body of benefits law," *Rutledge* v. *Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020), Congress broadly preempted state laws that would interfere with uniform ERISA plan administration.  In an express preemption clause that is "conspicuous for its breadth," *FMC Corp.* v. *Holliday*, 498 U.S. 52, 58 (1990), Congress directed that ERISA's "provisions

36

. . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. 29 U.S.C. § 1144(a). Congress adopted this expansive preemption provision because it believed that uniformity was critical for minimizing the administrative and financial burdens for plans that provide benefits across multiple jurisdictions. *Rutledge*, 592 U.S. at 86.

Importantly, a state law can unlawfully "relate to" ERISA plans even if it only indirectly affects such plans. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 737 (1985) ("ERISA's broad pre-emption provision was intended to pre-empt any state law that 'relate[d] to' an employee-benefit plan, not merely those state laws that directly conflicted with a substantive provision in the federal statute."). Accordingly, the Supreme Court has instructed held that a state law impermissibly "relates to" ERISA plans if it has any "connection with" or "reference to" such plans. *Rutledge*, 592 U.S. at 91. A state law has an impermissible "connection with" ERISA plans if it "governs a central matter of plan administration or interferes with nationally uniform plan administration." *Id.* at 87 (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016)). A state law may also be preempted if the "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage." *Id.* (quoting *Gobeille*, 577 U.S. at 320). Such laws are preempted because they impermissibly intrude on plan administration and interfere with the statutory goal of national uniformity. *Id.* at 86-87.

HB 1150 bears an impermissible "connection with" ERISA plans under each of those approaches. For starters, the law restricts plan officials from "structur[ing] benefit plans in particular ways." *See Rutledge*, 592 U.S. at 86-87. Many ERISA plans rely on PBM-

37

affiliated pharmacies (whether retail, mail-order, or specialty) when designing their pharmacy networks for a variety of reasons.  Consider, for instance, a plan that relies on PBM-affiliated mail-order pharmacies to serve rural communities.  By shutting down many mail-order pharmacies that operate in the Arkansas market, HB 1150 likely requires this plan to include many more brick-and-mortar pharmacies in its Arkansas network even though that network would be more expensive to maintain.  As this simple example illustrates, questions regarding the scope of a pharmacy network have long been understood as a "key benefit design[] for an ERISA plan."  *Pharm. Care Mgmt. Ass'n* v. *Mulready*, 78 F.4th 1183, 1198 (10th Cir. 2023).

HB 1150 also strikes at the heart of ERISA plan management because many plans currently rely on PBM-affiliated pharmacies to keep costs low.  As explained above, PBM-affiliated pharmacies are attractive for plan sponsors because such pharmacies can leverage the efficiencies of vertical integration to yield cost savings for both the plan sponsor and plan participants.  But HB 1150 takes this choice off the table for virtually any plan that intends to offer coverage in Arkansas.  By barring any PBM-affiliated pharmacies from operating in the State, the law denies plan sponsors the discretion to choose to offer this lower-cost option to their participants—in other words, it unlawfully "prohibits employers from structuring their employee benefit plans in a [certain] manner."  *Shaw* v. *Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983); *see Travelers*, 514 U.S. at 668 (recognizing that a state law may be preempted where it "effectively restrict[s] [an ERISA plan's] choice of insurers").  By the same token, HB 1150 will force ERISA plans to use less efficient pharmacies even if that means raising prices for plan beneficiaries.

38

HB 1150 also impermissibly interferes with ERISA's core goal of nationally uniform plan administration. The law would require health benefit plans to either design pharmacy networks for beneficiaries differently in Arkansas than in other States or rearrange their entire pharmacy networks to meet Arkansas's idiosyncratic requirements. Going a step further, if this law were allowed to stand and other States followed suit, it would quickly become impossible for employers to navigate this web of patchwork regulations. *See Gobeille*, 577 U.S. at 326 (a state law is preempted if it "imposes duties" that conflict with ERISA's goal of providing "a single uniform national scheme for the administration of ERISA plans without interference from laws of the several States"). That is precisely the outcome Congress sought to avoid by adopting ERISA's conspicuously broad express preemption provision. *See Fort Halifax Packing Co., Inc.* v. *Coyne*, 482 U.S. 1, 11 (1987).

### 2.      HB 1150 is preempted by Medicare Part D.

Medicare is a federal health insurance program administered by the Centers for Medicare and Medicaid Service for people who are 65 years and older or with certain disabilities. As relevant to this case, Part D of the Medicare program invites private insurers to offer prescription drug plans to Medicare beneficiaries, so long as those private insurers comply with a comprehensive set of federal rules governing the program. Those rules provide detailed requirements covering every aspect of how the plan furnishes prescription drug benefits to beneficiaries, from negotiation of prices and cost-sharing to the establishment of pharmacy networks and the general terms that may be included in pharmacy contracts. *See generally* 42 C.F.R. 423.120.

To ensure that plans providing Medicare Part D drug benefits (including comprehensive Medicare Advantage plans that include Part D benefits) would be governed

39

uniformly by federal law, Congress imbued both Medicare statutes and CMS regulations with broad preemptive force.  The statute empowers the Secretary of CMS to "establish by regulation other standards" beyond those set forth in the statute to govern plans, 42 U.S.C. § 1395w-26(b)(1), and then provides that "[t]he standards established" under that authority "shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to" the relevant Part D benefits offered by private insurers, *id.* § 1395w-26(b)(3); *see* 42 U.S.C. § 1395w-112(g).[2]

Through this broad express preemption provision, Congress has preempted "a broad swath of state laws"; *i.e.*, any state law that "regulate[s] the same subject matter as a federal Medicare Part D standard."  *Pharm. Care Mgmt. Ass'n* v. *Wehbi*, 18 F.4th 956, 971-972 (8th Cir. 2021) (internal quotation omitted).  More specifically, a state law is preempted whenever (1) Congress or CMS "has established 'standards' in the area regulated by the state law; and (2) the state law acts 'with respect to' those standards." *Pharm. Care Mgmt. Ass'n v. Rutledge*, 891 F.3d 1109, 1113 (8th Cir. 2018), *rev'd on other grounds,* 592 U.S. 80.  The term "standard" in this context refers to "a [Medicare Part D] statutory provision or a regulation duly promulgated [under Medicare Part D] and published in the Code of Federal Regulations." *Id.* at 1113 n.1.  It does not matter whether state law *conflicts* with the relevant standards; all that is necessary to trigger preemption

---

[2]  The quoted provisions of 42 U.S.C. § 1395w-26(b) appear in Part C of the Medicare statute, which allows private insurers to offer Medicare plans more generally.  Congress then imported this same preemption provision and structure into the later-enacted Part D. *See* 42 U.S.C. § 1395w-112(g) ("The provisions of section[] . . . 1395w–26(b)(3) of this title shall apply with respect to PDP sponsors and prescription drug plans under this part in the same manner as such sections apply to MA organizations and MA plans under part C.").

is subject-matter overlap between the standards and the application of state law. *See Wehbi*, 18 F.4th at 971 (preemption applies when state law operates to "occupy the same 'place'" as "federal Medicare Part D standards").

HB 1150 falls squarely within the wide sweep of this express preemption provision because it imposes substantial limits on plan sponsors' ability to provide Part D benefits across the country under uniform federal regulations governing pharmacy networks and benefit design. *See Mulready*, 78 F.4th at 1206 (state law "should not apply" because Part D "is a federal program operated under [f]ederal rules") (citation and quotation marks omitted). Like ERISA, Medicare Part D regulations guarantee plan sponsors significant discretion to build and maintain pharmacy networks (including "preferred" networks) that efficiently and uniformly provide prescription drug benefits to plan participants. *See* 42 U.S.C. § 1395w-22(d)(1) (Part D plans have the prerogative to "select the providers from whom the benefits under the plan are provided"); *see also* Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588, 4614 (Jan. 28, 2005) ("We interpret the statute to allow for flexibility in plan design, within the constraints of statutory language, to promote competition."). By prohibiting PBM-affiliated pharmacies from operating in Arkansas, HB 1150 overrides the discretion and flexibility afforded to plan sponsors under federal standards. The law eliminates an entire category of pharmacies from a Part D sponsor's potential network—including mail-order and specialty pharmacies that can greatly facilitate network design by providing services that cannot easily be replaced by conventional brick-and-mortar pharmacies in a certain area.

41

HB 1150's categorical ban of PBM-affiliated pharmacies interferes with other standards that are part of CMS's regulatory framework for Part D sponsor plans. One such standard expressly contemplates that Part D plans can rely on mail-order pharmacies to augment access for beneficiaries. *See* 42 C.F.R. 423.120(a)(3). But the vast majority of mail-order pharmacy prescriptions in Arkansas are provided by out-of-state PBM-affiliated pharmacies, and HB 1150 takes all of those options off the table. Another federal standard allows Part D sponsors to establish preferred pharmacy networks with cost-sharing discounts. *See* 42 C.F.R. 423.120(a)(9). Today, CVS pharmacies in Arkansas are "preferred pharmacies" for many Part D plans pursuant to this standard. But HB 1150 takes that option away from Part D sponsors by forcing CVS pharmacies to shutter in the State, solely because they are affiliated with a PBM.

The Medicare preemption clause's exemption for "State licensing laws" does not change any of this. Congress plainly did not intend that exemption to authorize States to readily evade the statute's preemptive force simply by labeling every regulation a licensing requirement. Recognizing as much, CMS has explained that "State licensure requirements cannot be used as an indirect way to regulate MA plans by imposing requirements not generally associated with licensure." Medicare Program, 70 Fed. Reg. at 4663-64. Instead, the licensing exception narrowly encompasses only traditional objects of licensing under state law: "[T]he exception for State laws that relate to 'State licensing' must be limited to State requirements for becoming State licensed . . . includ[ing] requirements such as filing articles of incorporation with the appropriate State agency, or satisfying State governance requirements." *Id*. at 4663-4664.

42

HB 1150 does not fall within this licensing exception because it is not addressed to anything resembling traditional licensing standards. It is a law categorically and arbitrarily barring pharmacies affiliated with certain disfavored entities (PBMs) from operating in the State. Whatever the limits of the exception, it cannot allow states to smuggle regulation of Medicare plans into licensing regimes in a manner that would undermine Congress's goal of having these plans operate under federal rules. To hold otherwise would mean that "any state could choose by artful legislating to ignore the federal standards, thereby creating the very situation that the doctrine of federal preemption is intended to avoid." *Arcadian Health Plan, Inc.* v. *Korfman*, 2010 WL 5173624, at \*5 (D. Me., Dec. 14, 2010).

## II.    PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT PRELIMINARY INJUNCTIVE RELIEF.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp.* v. *Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024) (citation and quotation marks omitted). The alleged harm "need not be occurring or be certain to occur before a court may grant relief." *Richland/Wilkin Joint Powers Auth.* v. *United States Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016) (citation and quotation marks omitted). CVS has plainly made this showing. HB 1150 not only poses an existential, irreversible threat to CVS's business in Arkansas, but also inflicts multiple here-and-now injuries on CVS that cannot be adequately redressed by money damages. Absent preliminary injunctive relief, CVS will be irreparably harmed in at least four ways.

First, if CVS is forced to shutter its 23 retail pharmacies, long-term care pharmacy, and mail-order and specialty pharmacy offerings in the State, it will cost CVS more than

$100 million from asset impairment and annual loss of income. Sovereign immunity bars CVS from ever being able to recover damages for that loss. *Missouri* v. *Trump*, 128 F.4th 979, 996 (8th Cir. 2025) (a party injured by an unlawful regulation "cannot recoup [its] financial loss through a damages award because of sovereign immunity") (citation omitted). This alone suffices to establish irreparable injury. *See Thunder Basin*, 510 U.S. at 220-221 (Scalia, J., concurring) ("compliance costs" of "a regulation later held invalid almost always *produces* the irreparable harm" because they are by definition not recoverable); *see also Chamber of Com. of U.S.* v. *Edmondson*, 594 F.3d 742, 770-771 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").

Second, the shutdown of CVS's operations—even if they could later resume at the conclusion of several years of litigation—would also result in the loss of substantial customer goodwill and significant damage to CVS's standing in the hypercompetitive pharmacy market. CVS has built its competitive position in Arkansas, and its goodwill, over many years of high-quality service, but these gains would be erased in one fell swoop. Again, there is no way for CVS to seek compensation for that injury through a damages award.

Third, CVS faces ongoing deterioration of its customer and employee relationships from the law. Indeed, HB 1150 is already having its intended effect: to redirect customers from out-of-state pharmacies such as CVS to in-state competitors. Since mid-March 2025, for instance, Walmart has received nearly twice as many prescriptions transferred from CVS retail pharmacies as from CVS's next closest competitor. And CVS will continue to

44

lose customers—some of whom may never go back once they have already been forced to change drug-distribution channels and develop new relationships with pharmacists—as HB 1150's effective date approaches. The loss of goodwill and customer loyalty cannot easily be calculated, much less fully compensated at the conclusion of the ordinary litigation process.

CVS is also struggling to retain or hire employees in Arkansas because of HB 1150's impending date of operation. Since HB 1150 was signed, CVS has already lost 31 employees across its 23 stores. Employees understandably do not want to sign up to work for a company when the State's lawmakers have openly boasted that a newly enacted law will oust that company from the marketplace. And as soon as July 1, 2025, the Board of Pharmacy may begin issuing written notice to CVS's pharmacies that the Board "reasonably believes" violate HB 1150's prohibitions. Ark. Code Ann. § 17-92-417(a)(1). Once retail pharmacies receive these notices, the challenges of retaining key personnel in Arkansas will become even more difficult.

Fourth, the Dormant Commerce Clause protects a party's constitutional right to engage in free trade. *See Dennis* v. *Higgins*, 498 U.S. 439, 448 (1991) (the Dormant Commerce Clause confers citizens with "a 'right' to engage in interstate trade free from restrictive state regulation"). The Eighth Circuit has repeatedly recognized that the loss of a constitutional right—even if only temporary—constitutes an irreparable harm. *See Morehouse Enters.*, *LLC* v. *Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023); *Ng*, 64 F.4th at 998. HB 1150 infringes on CVS's constitutional right to engage in free trade here and now because the law prevents the company from

45

investing in Arkansas and building out the services and products that its retail pharmacies, specialty pharmacy, and mail-pharmacy operations provide in the State. And in seven months, HB 1150 will require CVS to shut down all of its operations in Arkansas altogether.

The extraordinary threat that CVS faces from HB 1150 forces the company to request injunctive relief from this Court. Only this Court's immediate intervention can protect CVS's legal rights until a final judgment is entered.

## III. THE PUBLIC INTEREST SUPPORTS PRELIMINARY RELIEF.

The remaining preliminary-injunction factors—whether issuing the injunction would harm others and whether the injunction furthers the public interest—merge when the government is the defendant. *See Nken*, 556 U.S. at 435. These factors also favor CVS because the State has no valid interest in enforcing an unlawful law. *See Missouri*, 128 F.4th at 997 (reasoning that the government has no interest in unlawful action). And the public has a strong interest in ensuring that all government actors comply with the U.S. Constitution. *See Brandt ex rel. Brandt* v. *Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022).

In this case, the public interest supports preliminarily enjoining the enforcement of HB 1150 for even more fundamental reasons. It is no exaggeration to say that HB 1150 threatens to completely upend the Arkansas pharmacy market, at great disruption and cost to its citizens. Every single CVS-affiliated retail pharmacy will be forced to close, and CVS mail order and specialty pharmacies will be forced to cease operations in the State. As a result, in a matter of months, over 360,000 Arkansans who rely on CVS will have to find new pharmacies to fill more than 3 million prescriptions.

While many patients might, after time and effort, be able to find a new pharmacy, others may not. Of the 70,000 prescriptions filled by CVS Specialty last year for Arkansans,

46

more than one third were LDDs that, by definition, are available at only a handful of pharmacies. Roughly 2,000 Arkansans received LDDs from CVS's specialty pharmacies last year for conditions such as cancer, multiple sclerosis, and hemophilia. And CVS is the *only* pharmacy chain that dispenses 12 EDDs for conditions such as renal disease and bladder cancer. No other pharmacy in the State currently has access to these drugs. If CVS's Specialty Pharmacy can no longer serve members in Arkansas, vulnerable patients in the State will not be able to fill their prescriptions for EDDs until another pharmacy goes through the difficult and resource-intensive process of obtaining distributor agreements based on each manufacturer's criteria. Similar problems will also confront Arkansans who require LDDs because many specialty drugs are only available through PBM-affiliated pharmacies.

To be sure, the law allows the Board of Pharmacy to extend permits for pharmacies that distribute specialty drugs until September 1, 2027, but that extension is only a temporary solution. The Board has no authority to push that date further back. So even if the impact is formally delayed, that is an inherently temporary fix. And replacement pharmacies be unable to readily step into the void: specialty-drug networks are difficult to unravel and feature a disproportionate number of PBM-affiliated pharmacies. Governor Sanders estimated in a recent opinion editorial, for instance, that PBM-affiliated pharmacies provide roughly 70% of the specialty drugs on the market. *See* Sanders, *My State Is Taking on the Middlemen Who Inflate Drug Prices*, *supra.* HB 1150 thus raises the serious risk for existing patients, who require complex specialty medications to manage life-threatening illnesses, that their care will be severely disrupted.

In light of these serious consequences, the public interest overwhelmingly favors an order putting HB 1150 on hold until this Court determines its constitutionality.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an order preliminarily enjoining Defendants from enforcing HB 1150.

Dated:  June 11, 2025

Respectfully submitted,

/s/ Ben Hall
J. Carter Fairley, AR BIN 99068
Ben C. Hall, AR BIN 2010159
BARBER LAW FIRM PLLC
1 Allied Drive
Suite 1600
Little Rock, AR  72202
501-372-6175 / 888-412-3288 – facsimile
cfairley@barberlawfirm.com
bhall@barberlawfirm.com

O'MELVENY & MYERS LLP

Meaghan VerGow*
Brian D. Boyle*
Deanna M. Rice*
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

*Attorneys for Plaintiffs*

*admitted *pro hac vice*

SULLIVAN & CROMWELL LLP

Jeffrey B. Wall*
Judson O. Littleton*

SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

*Attorneys for Plaintiffs*

*admitted *pro hac vice*